*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | |
|---|---|
| SEA HUNTERS, LP, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| v. | ) No. 2:08-cv-272-GZS |
| | ) |
| THE S.S. PORT NICHOLSON, | ) |
| Her Tackle, Apparel, Cargo, | ) |
| Appurtenances, and Property, in Rem, | ) |
| | ) |
| Defendant | ) |

*MEMORANDUM DECISION AND ORDER ON MOTION FOR PROTECTIVE ORDER*

As contemplated by my report and order of January 4, 2013, *see* ECF No. 97 at 4-5, the claimant Secretary of State for Transport of the United Kingdom ("UK DfT") has filed a motion for a protective order with respect to requests for production ("RPDs") served upon him on January 18, 2013, by the plaintiff Sea Hunters, LP ("Sea Hunters"). *See* Motion for Protective Order ("Motion") (ECF No. 108). Sea Hunters is the salvor-in-possession of the wreck site of a vessel that it has identified as The S.S. Port Nicholson ("Port Nicholson"), a cargo ship torpedoed and sunk by a German submarine while *en route* to New York in 1942. *See* Plaintiff's Amended Verified Complaint *in Rem* ("Amended Complaint") (ECF No. 82) ¶¶ 5-12.

The UK DfT takes the position that the RPDs are premature, and therefore irrelevant and unduly burdensome, until Sea Hunters seeks a salvage award for specific property about which discovery can be conducted. *See* Motion at 1, 8-9. Sea Hunters points out that the UK DfT has not only claimed ownership of the vessel and her cargo but also has stated that, as purported owner, he does not consent to Sea Hunters' salvage operation. *See* Sea Hunters' Response to Intervenor's Objection to Scheduling Order (DE 106) and Motion for Protective Order (DE 108)

1

("Response") (ECF No. 113) at 6, 8.  Sea Hunters represents that this calls into question the feasibility of ongoing salvage operations, warranting discovery aimed at testing the validity of the UK DfT's ownership claim.  *See* ECF No. 97 at 3.  For the reasons that follow, I conclude that the requested discovery is indeed relevant and that this court has the power to compel the UK DfT to respond.  Accordingly, the UK DfT falls short of demonstrating good cause for the protective order, and the Motion is denied.

## I. Applicable Legal Standards

Rule 26 of the Federal Rules of Civil Procedure outlines general provisions governing discovery in a civil action.  The scope of civil discovery is broad:

> Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense – including the existence, description, nature, custody, condition, and location of any documents or other tangible things and the identity and location of persons who know of any discoverable matter.  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b).  Because the scope of discovery is so broad, the Rules provide that a court may issue a protective order when the circumstances call for one.  Pursuant to Rule 26(c), a court may issue a protective order, "for good cause, . . . to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense[.]"  Fed. R. Civ. P. 26(c)(1).  Among other possibilities, a court may forbid the discovery from taking place, limit the scope of disclosure or discovery, limit who may see the discovery materials, and require that material be filed under seal.  *See* Fed. R. Civ. P. 26(c)(1)(A)-(H).  The movant bears the burden of making a specific demonstration of the necessity for a protective order.  *See, e.g., Anderson v. Cryovac, Inc.,* 805 F.2d 1, 7–8 (1st Cir. 1986).  "If a motion for a protective order is wholly or partly

denied, the court may, on just terms, order that any party or person provide or permit discovery." Fed. R. Civ. P. (c)(2).

## II. Background

Sea Hunters commenced this "treasure salvage" admiralty *in rem* case on August 19, 2008, having salvaged six metal items from a then-unidentified wrecked and abandoned merchant vessel and brought them to Gorham, Maine, within the jurisdiction of this court. *See* Plaintiff's Verified Complaint *in Rem* (ECF No. 1) ¶¶ 7-8. The court granted Sea Hunters' motions to execute a warrant for the arrest of the defendant vessel and to appoint Sea Hunters as substitute custodian to preserve and maintain all artifacts, cargo, and property recovered in its salvage of the vessel and to inventory and account for the same to the court. *See* ECF No. 8. Sea Hunters has made periodic reports to the court, including some joint reports with the UK DfT subsequent to his appearance in this case. *See* ECF Nos. 24, 28, 30, 32, 34, 37, 56, 93, 127.

On August 11, 2009, attorneys for the UK DfT first entered a "restricted appearance" within the meaning of Rule E(8) of the Supplemental Rules for Admiralty or Maritime Claims. *See* ECF No. 26. Rule E(8) provides:

> An appearance to defend against an admiralty and maritime claim with respect to which there has issued process in rem, or process of attachment and garnishment, may be expressly restricted to the defense of such claim, and in that event is not an appearance for the purposes of any other claim with respect to which such process is not available or has not been served.

Fed. R. Civ. P., Supp. R. E(8). An attorney since appearing on his behalf likewise has entered a restricted appearance within the meaning of Rule E(8). *See* ECF No. 35.

On May 9, 2012, the UK DfT filed a motion to set aside, insofar as it pertained to him, a default entered on December 31, 2008, against all persons, entities, or parties with claims against the vessel who had failed to plead or otherwise defend their claims. *See* ECF Nos. 17-18, 41.

He also filed a verified statement of right or interest, claiming ownership of the Port Nicholson and her cargo by operation of law, including but not limited to the War Risks Insurance Act 1939, c. 57 (Eng.), in force at the time the vessel was sunk by enemy action, and the Marine Insurance Act, 1906, c. 79 § 1 (Eng.). *See* Verified Statement of Right or Interest ("Verified Claim") (ECF No. 53). The UK DfT further stated that he had not abandoned his ownership or other rights in the vessel or cargo, had expressly refused salvage of such vessels absent express consent of the United Kingdom, and had not consented to the salvage of the Port Nicholson by Sea Hunters. *See id*. at 2. He added that the salvage of the vessel without his consent might be barred by, without limitation, U.S. or U.K. statutes, applicable treaties, or international law. *See id*.

On June 4, 2012, the court granted the UK DfT's motion to set aside default. *See* ECF No. 52. In a Joint Status Report filed with the court on June 19, 2012, the parties stated that, on May 21, 2012, Sea Hunters provided counsel for the UK DfT access to all material salvaged from the Port Nicholson as of that date, none of which provided a factual basis for definitively identifying the *in rem* vessel as the Port Nicholson. *See* ECF No. 56 at 1. The parties further reported that (i) Sea Hunters had provided a copy of a DVD/video purporting to show the name "Port Nicholson" on the bow of the vessel, and (ii) the UK DfT was unable to discern the name of the vessel from the video footage provided, but accepted Sea Hunters' assertion that the vessel was the Port Nicholson. *See id*. at 1-2.

In a Procedural Order & Report of Conference dated June 25, 2012, issued following a conference with the court in which counsel for both Sea Hunters and the UK DfT participated, Judge Singal stated:

> The purpose of the conference was to determine how to move this case forward in an expeditious manner and address any issues related to the Court's subject matter

4

jurisdiction. After hearing from both sides, the Court will await the filing of a responsive pleading by UK DfT on or before July 16, 2012. If UK DfT chooses to file a motion, the Court will allow full briefing on that motion and take it under advisement once that briefing i[s] complete. As discussed with the parties, the Court expects that the parties will both be prepared to complete discovery on the preliminary issue of identification of the vessel within 180 days of the Court issuing a scheduling order. In the absence of a request from the parties that a scheduling order issue sooner, the Court anticipates issuing a scheduling order upon receipt of UK DfT's responsive pleading or upon filing its decision on any initial motion, assuming that the decision does not dispose of the case.

ECF No. 62 at 1-2.[1]

In lieu of filing an answer, the UK DfT on July 16, 2012, filed a motion for a more definite statement, *see* ECF No. 65, which Judge Singal granted on August 20, 2012, *see* ECF No. 80. On September 10, 2012, Sea Hunters duly filed an amended verified complaint *in rem* identifying the vessel as the Port Nicholson. *See* Amended Complaint at 1. Sea Hunters described the Port Nicholson as a refrigerated cargo ship built in 1919, owned by Port Line Limited (formerly the Commonwealth and Dominion Line), and operated by American & Australian S.S. Line. *See id.* ¶¶ 7-8. Sea Hunters alleged that the Port Nicholson originally shipped between the United Kingdom, Australia, and New Zealand but, during World War II, transported various commercial cargos around the world. *See id.* ¶ 9. Sea Hunters stated that, on June 16, 1942, while the Port Nicholson was *en route* from Halifax, Nova Scotia, to New York as part of a convoy of six merchant vessels being escorted by four corvettes and a destroyer, she was torpedoed by a German submarine and sank in approximately 225 meters of water beyond the territorial boundaries of the United States. *See id.* ¶¶ 10-12. Sea Hunters sought continued exclusive possession of the wreck site, the enjoining of any interference with its exclusive

---

[1] Although Judge Singal contemplated discovery on the preliminary issue of identification of the vessel, the UK DfT has not argued, in support of his request for a protective order, that discovery as to his ownership claim is premature because the identity of the *vessel* is as yet unknown. *See generally* Motion; Reply. He has emphasized, instead, that the identity of any salvageable *cargo* is as yet unknown. *See, e.g.*, Motion at 1-2, 5-6; Reply at 1-2. For purposes of this motion, both parties seemingly have assumed that the vessel is the Port Nicholson. Accordingly, I have done the same.

possession and ongoing salvage, and the confirmation of a title and/or salvage award against all claimants and all the world.  *See id.* at 5.

The UK DfT answered the amended complaint on October 9, 2012, stating, *inter alia*, that he was without knowledge as to the identity or specific location of the merchant vessel described therein but that, to the extent that Sea Hunters proved that the vessel was the Port Nicholson, the Port Nicholson was requisitioned by the Government of the United Kingdom during World War II and transported cargos at the direction of the Ministry of Shipping and subsequently the Ministry of War Transport.  *See* Answer to Amended Complaint by Claimant Secretary of State for Transport of the United Kingdom (ECF No. 86) ("Answer") ¶¶ 3, 9.  He alleged, among his affirmative defenses, that (i) the Port Nicholson became property of the Government of the United Kingdom after she sank and has been managed as Crown property by various arms of the government since the end of World War II, most recently the UK DfT, *see id.* at 6, ¶ 6, (ii) the Government of the United Kingdom owns and has never abandoned or relinquished title to the Port Nicholson or her cargo, *see id.* at 5, ¶ 3, and (iii) the UK DfT's rejection of Sea Hunters' salvage services before Sea Hunters provided any salvage services of value to the UK DfT bars any salvage award, *see id.* at 5, ¶ 4.

On November 14, 2012, Sea Hunters served a first request for production of documents ("First RPD") on the UK DfT.  *See* First RPD, Exh. 3 (ECF No. 106-3) to Objection to Scheduling Order [DE98] (ECF No. 106). Sea Hunters' 17 requests bear on the UK DfT's claim of ownership of the Port Nicholson and her cargo, for example, requesting documents (i) between the government of the United Kingdom and any insurance company regarding the loss of the Port Nicholson, (ii) supporting the UK DfT's present claim of ownership of any of the cargo onboard the Port Nicholson at the time of its loss on June 16, 1942, and (iii) showing any

efforts by the government of the United Kingdom to attempt to locate the wreck site of the Port Nicholson or attempt to salvage the vessel or any of her cargo. *See id*. at 5-6, ¶¶ 4, 6, 9.

The UK DfT objected to the First RPD on several grounds, among them, that the discovery was premature because (i) nothing of value had been salvaged, (ii) no scheduling order had issued in the case, nor could one issue absent the salvage of an item of value, and (iii) the parties had not yet held a Rule 26(f) conference, nor could they absent the salvage of anything of value. *See* Objection to Plaintiff's First Request for Production (ECF No. 108-2), Exh. 1 to Motion, ¶¶ 4-14.

The parties were unable to resolve this dispute privately, as a result of which I convened a discovery teleconference on January 4, 2013. *See* ECF No. 97. Treating the dispute as a motion by Sea Hunters to compel responses to its First RPD, I denied it without prejudice, reasoning that the discovery was not authorized inasmuch as Rule C(b)(6) of the Supplemental Rules for Admiralty or Maritime Claims was inapposite, and the parties sharply disputed whether a Rule 26(f) conference had occurred. *See id*. at 4.

As of the date of the teleconference, no scheduling order had issued as contemplated by Judge Singal's report and order of June 25, 2012. *See id*. at 2. I reported to the parties that I had checked with the Clerk's Office and learned that this was an oversight. *See id*. I directed that the Clerk's Office issue a Standard Track scheduling order in the case, filed later that day at ECF No. 98, and set deadlines for the parties' Rule 26(f) conference, Sea Hunters' reissuance of the First RPD and the UK DfT's response to it, and the briefing of this motion for a protective order with respect to that RPD. *See id*. at 4-5. I contemplated that the parties might also wish to file motions to modify the scheduling order, *see id*. at 5, as indeed they have, *see* ECF Nos. 103, 108,

but that, as a practical matter, the court likely would not adjudicate those motions until it decided this motion, *see* ECF No. 97 at 5.

### III. Discussion

The UK DfT seeks a protective order pursuant to which he need not respond to the First RPD or any other discovery until Sea Hunters seeks a salvage award for specific property about which discovery can be conducted. *See* Motion at 1. He protests that Sea Hunters seeks documents on the ownership of and insurance on property that has not been and may never be salvaged, is not within the court's territorial jurisdiction, and may not be on the vessel. *See id*. He argues that, on these facts, the requested discovery is premature, as a result of which it is irrelevant and unduly burdensome, warranting protection. *See id*. at 6-9.

The UK DfT is correct that under the law of salvage and the law of finds, the completion of successful salvage operations is a predicate to an award of compensation in the form of a salvage award or title to the recovered property. *See, e.g., The Blackwall*, 77 U.S. 1, 12 (1869) ("Success is essential to [a salvage] claim; as if the property is not saved, or if it perish, or in case of capture if it is not retaken, no compensation can be allowed."); *Odyssey Marine Exploration, Inc. v. Unidentified, Wrecked, & Abandoned Sailing Vessel*, 727 F. Supp.2d 1341, 1344 (M.D. Fla. 2010) (under the law of salvage, "[a]fter recovering lost property, the salvor obtains a maritime lien that allows the salvor to proceed *in rem* to secure a salvage award"; under the law of finds, "a finder [can] acquire title to abandoned property by reducing the property to his or her possession") (citations and internal punctuation omitted).

Nonetheless, it does not follow that the exploration or adjudication of a claim of ownership *necessarily* must await the completion of salvage operations or even the retrieval of something "valuable." In this case, the UK DfT has not only claimed ownership of the vessel

and her cargo but also has placed Sea Hunters on express notice that he does not consent to its salvage operation. *See* Verified Claim at 2; Answer at 5, ¶ 4. He has alleged that his rejection of Sea Hunters' salvage services bars any salvage award by virtue of an international convention and U.S. maritime law. *See* Answer at 6, ¶¶ 5-6. If Sea Hunters, which has identified the wreck as the Port Nicholson, proceeds in the face of the UK DfT's express rejection of its salvage services, any eventual salvage award may be jeopardized.

The UK DfT asserts that he has not sought to control Sea Hunters' salvage operation. *See, e.g.*, Motion at 4 (stating that "there is no contest over control of the wreck site"); UK DfT's Reply to Plaintiff's Response to the Motion for Protective Order by the UK DfT ("Reply") (ECF No. 117) at 3 (distinguishing case cited by Sea Hunters on the basis that it "involved a dispute over the right to work the wreck site, in no way resembling the case at bar"). Yet, from all that appears, he continues to reject its salvage services. During my teleconference with counsel on January 4, 2013, Sea Hunters represented that this has a chilling effect on the salvage operation, and it stands to reason that it would. This, in turn, is a sufficiently palpable impact to render discovery regarding the UK DfT's ownership claim relevant.

Nor does the court lack jurisdiction to compel the UK DfT to respond to the discovery at issue.

> To avoid an unreasonable constraint on *in rem* jurisdiction, admiralty law recognizes two exceptions to the requirement that the *res* remain within the territorial jurisdiction. The first exception, established in the litigation over the wreck of *Neustra Señora de Atocha*, allows the exercise of "*quasi in rem* jurisdiction" over the *res* to adjudicate rights among parties over which the court enjoys *in personam* jurisdiction (even though the res is outside the territorial jurisdiction of the court). The second exception, established in the litigation over the *RMS Titanic*, extends *in rem* jurisdiction by constructive possession and allows the declaration of an exclusive right to salvage a wreck in international water.

*Odyssey Marine*, 727 F. Supp. at 1346.

With respect to the first exception – the exercise of *quasi in rem* jurisdiction over the res to adjudicate rights among parties over whom the court enjoys *in personam* jurisdiction – the UK DfT states that, through his restricted appearance, he has appeared solely for the purpose of defending a maritime lien claim and cannot be compelled to defend against a lien that does not exist. *See* Motion at 4. However, Rule E(8) restricts a claimant's appearance to the defense of a maritime *claim*, not a maritime *lien*. *See* Rule E(8). The UK DfT's restricted appearance pursuant to Rule E(8) "does not shield [his] interests in the defendant *res* from being adjudicated." *Cobb Coin Co. v. The Unidentified, Wrecked & Abandoned Sailing Vessel*, 549 F. Supp. 540, 555 n.14 (S.D. Fla. 1982) ("*Cobb Coin II*"). Instead, "Rule E(8) protects claimants in a *res* from subjecting themselves to general *in personam* liability beyond the value of the *res*." *Id. See also, e.g., United States v. Marunaka Maru No. 88*, 559 F. Supp. 1365, 1370-71 (D. Alaska 1983) (same). Sea Hunters does not seek to subject the UK DfT to *in personam* liability beyond the value of the *res*. Rather, it wants to test the bases of the UK DfT's claim of ownership with a view to determining the feasibility of its continued salvage operation. *See, e.g.,* Letter to me from David Paul Horan dated December 19, 2012, Exh. 3 (ECF No. 108-3) to Motion, at 2-3. The UK DfT's restricted appearance neither prevents this discovery nor strips the court of jurisdiction to compel it.[2]

---

[2] The UK DfT argues that discovery without treasure is not only meaningless but also excludes other sovereigns or institutions that Sea Hunters has proclaimed may or may not have an interest in the property but has not served, as a result of which discovery would have to be conducted all over again when and if materials were actually salvaged. *See* Motion at 6. The appearance of additional claimants could indeed lead to additional discovery. There is "an important caveat to the exercise of *quasi in rem* jurisdiction." *Odyssey Marine*, 727 F. Supp. at 1347. "If a court exercises personal jurisdiction over the parties but not jurisdiction over the *res*, the court adjudicates rights only between the parties to the dispute. . . . [T]he court cannot adjudicate the rights of an absent third party over whom the court enjoys no jurisdiction." *Id.* Nonetheless, I do not view this possibility as preventing discovery bearing on the actual controversy between the plaintiff and the UK DfT, the single claimant who has thus far appeared.

The second exception – the extension of *in rem* jurisdiction by constructive possession, allowing the declaration of an exclusive right to salvage a wreck in international water – "complements the law of maritime salvage, which vests certain rights in a salvor because of his interest in completing his salvage operation without interference from others." *Moyer v. The Wrecked & Abandoned Vessel Known as The Andrea Doria*, 836 F. Supp. 1099, 1104 (D.N.J. 1993) (describing second exception as "look[ing] to the future, with the reasonable likelihood that the salvage operation will result in other portions of the shipwreck being brought into the territorial and thus *in rem* jurisdiction of the court."). As described by the United States District Court for the Southern District of Florida:

> [O]nce a salvor who discovers and brings up an artifact from an identifiable wreck site initiates suit by taking that object into federal court, the court acquires jurisdiction not only to adjudicate the disposition of the article already within its territorial jurisdiction, but maritime jurisdiction (based on in personam principles) to adjudicate disputes between competing salvors, and in rem jurisdiction (coupled with in personam jurisdiction over the claimants) to dispose of all articles thereafter brought up from that site. The filing of such a suit is, as here, an open invitation (either at that time, or such time as an applicable interest may thereafter arise) for claimants and competing salvors to come before the court and make their alleged interests known.

*Cobb Coin Co. v. The Unidentified, Wrecked & Abandoned Sailing Vessel*, 525 F. Supp. 186, 197 (S.D. Fla. 1981) ("*Cobb Coin I*").

The UK DfT is not a competing salvor, but rather a purported owner. Nonetheless, courts have exercised jurisdiction not only over competing salvors but also over the claims of purported owners who have rejected third parties' salvage efforts. *See, e.g., Treasure Salvors, Inc. v. The Unidentified Wrecked & Abandoned Sailing Vessel*, 569 F.2d 330, 333, 335-36 (5th Cir. 1978) (modifying but affirming district court's grant of summary judgment in favor of plaintiff salvors, who had brought an *in rem* action for possession of and title to an unidentified wreck, and against the United States, after the United States intervened as a defendant and filed a

counterclaim asserting a property right in the *res*); *Cobb Coin I*, 525 F. Supp. at 190-91, 220 (granting preliminary injunction enjoining State of Florida, which had filed counterclaim based on purported ownership of wreck and claimed plenary authority to administer its salvage, from interfering with salvor's ongoing salvage operations or arresting its officers, agents, and employees).

The UK DfT seeks to distinguish this line of cases on the basis, *inter alia*, that the claimants affirmatively sought to stop or control the salvage of a wreck site, for example, through a counterclaim and a request for declaratory relief. *See* Reply at 2-6. He notes that no case cited by Sea Hunters "holds that a salvor, based on constructive *in rem* jurisdiction, can pursue discovery as a means for determining whether or not it wants to conduct salvage operations, or as a means of soliciting investors." *Id*. at 2. He posits that his "standard defensive prayer" for a judgment in his favor "is fundamentally different from the United States' counterclaim in *Treasure Salvors* or Florida's request for declaratory relief in *Cobb Coin*, which were aimed at defeating the plaintiff's right to conduct operations at the salvage site." *Id*. at 5.

Again, the UK DfT minimizes the impact of his express refusal to consent to Sea Hunters' salvage operation. He has indeed asserted control over the wreck site, placing Sea Hunters on notice that it proceeds at its peril. In these circumstances, the court properly exercises jurisdiction over the UK DfT consonant with his restricted appearance, combined with constructive *in rem* jurisdiction over property in international waters that is yet to be salvaged, to compel discovery bearing on his purported ownership even in the absence of the retrieval of items of value.[3]

---

[3] My conclusion that the UK DfT's refusal to consent to Sea Hunters' salvage operation constitutes a sufficiently palpable exercise of control over the wreck site to warrant the exercise of the court's *in rem* "salvage protection" jurisdiction is reinforced by dicta in *Fathom Exploration, LLC v. The Unidentified Shipwrecked Vessel or Vessels*, (*continued on next page*)

In sum, the requested discovery is relevant, and the court has the power to compel the UK DfT to respond. Accordingly, the UK DfT falls short of demonstrating good cause for the entry of the requested protective order.[4]

### IV. Conclusion

For the reasons discussed above, the Motion is **DENIED**. The UK DfT is **ORDERED** to produce to Sea Hunters, within 30 days of the date of this Order, documents in his possession, custody, or control that are responsive to the First RPD.[5] Consistent with my April 8, 2013, order granting the UK DfT's motion to stay scheduling order deadlines pending the instant ruling, *see* ECF No. 126, the Clerk's Office is **DIRECTED** to schedule a teleconference at the earliest convenience of the parties and the court to discuss needed modifications to the scheduling order. On the understanding that the issue of the identification of the vessel no longer is in serious dispute, the scheduling order is limited to the subject matter of the UK DfT's claim of ownership to the vessel and her cargo.

### *NOTICE*

*In accordance with Federal Rule of Civil Procedure 72(a), a party may serve and file an objection to this order within fourteen (14) days after being served with a copy thereof.*

---

352 F. Supp.2d 1218 (S.D. Ala. 2005). In *Fathom*, the United States District Court for the Southern District of Alabama expressed surprise that Fathom, the salvor, had taken the position that the court could not adjudicate the United States' and the State of Alabama's claims to ownership of an unidentified wreck until all recovery operations had been completed. *See Fathom*, 352 F. Supp.2d at 1227-28 & nn.12 & 15. Although the court did not need to reach the point, it observed with respect to the state's claim of ownership that "it would be a most unusual result if Fathom could continue salvage operations on the Shipwreck after facts came to light making clear that it was subject to the ASA [Abandoned Shipwreck Act, 43 U.S.C. §§ 2101 *et seq.*], conclusively defeating Fathom's rights under the laws of salvage and finds." *Id*. at 1227 n.12. The court added, "As a practical matter, the Court questions why Fathom would want to continue performing salvage operations gratis after the emergence of facts proving that the ASA applies and extinguishing Fathom's rights under the law of salvage and the law of finds." *Id*.

[4] To the extent that Sea Hunters invites the court to consider imposing sanctions on the UK DfT for bad faith, frivolous litigation, *see* Response at 15, I decline to do so. The Motion presents a thoughtful argument on a difficult issue that seemingly is of first impression. Neither side has cited case law squarely on point, and my research has disclosed none.

[5] I recognize that the UK DfT objects to specific RPDs on certain grounds other than irrelevance; for instance, that RPD No. 17 seeks legal authorities in the public domain. *See* Motion at 4-5. Pursuant to Local Rule 26(b), the parties are **DIRECTED** to meet and confer in a good-faith attempt to resolve any disputes over those specific objections and, to the extent said attempt is unsuccessful, to contact the court promptly for assistance.

*Failure to file a timely objection shall constitute a waiver of the right to review by the district court and to any further appeal of this order.*

Dated this 26th day of April, 2013.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge