UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| SEA HUNTERS, LP, | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| *v.* | ) | No. 2:08-cv-272-GZS |
| | ) | |
| THE S.S. PORT NICHOLSON, | ) | |
| Her Tackle, Apparel, Cargo, | ) | |
| Appurtenances, and Property, in Rem, | ) | |
| | ) | |
| *Defendant* | ) | |

## MEMORANDUM DECISION AND ORDER ON MOTION TO STRIKE AND RECOMMENDED DECISION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT AND MOTION FOR PRELIMINARY INJUNCTION

In this admiralty action arising from efforts to salvage the wreck and cargo of The S.S. Port Nicholson ("Port Nicholson"), a merchant ship sunk by German torpedoes in June 1942, plaintiff Sea Hunters, LP ("Sea Hunters") and intervening plaintiff Mission Recovery, LLC ("Mission Recovery") cross-move for summary judgment on Mission Recovery's intervening complaint, in which it seeks to replace Sea Hunters as salvor-in-possession of the wreck. *See* Plaintiff's Motion for Summary Judgment on Intervening Complaint ("Plaintiff's S/J Motion") (ECF No. 245); Mission Recovery LLC's Motion for Summary Judgment ("Intervenor's S/J Motion") (ECF No. 244); Intervening Complaint (Verified) ("Intervening Complaint") (ECF No. 162). Mission Recovery also requests oral argument on its motion for summary judgment, *see* Intervenor's S/J Motion at 19, and moves for a preliminary injunction barring Sea Hunters from conducting ongoing salvage activities pending the court's resolution of the cross-motions for summary judgment, *see* Mission Recovery LLC's Motion for a Stay and Preliminary Injunction (ECF No. 246).

The Secretary of State for Transport of the United Kingdom ("UK DfT"), who claims ownership of the vessel and her cargo, *see* ECF No. 53, has filed responses to each of the cross-motions, arguing, *inter alia*, that they should be denied on the basis that they are procedurally improper, *see* UK DfT Response to Plaintiff's Motion for Summary Judgment on the Intervening Complaint ("UK DfT Response/Plaintiff") (ECF No. 266) at 2-7; UK DfT Response to Mission Recovery Motion for Summary Judgment on the Intervening Complaint ("UK DfT Response/Intervenor") (ECF No. 262) at 4-16. Sea Hunters moves to strike the UK DfT's filings related to its motion for summary judgment. *See* Plaintiff's Motion To Strike ("Motion To Strike") (ECF No. 280).

I deny Mission Recovery's request for oral argument because the parties' extensive papers offer a sufficient basis on which to decide the cross-motions without additional delay, grant the Motion To Strike in part, with respect to those portions of the UK DfT's opposing brief that bear on the merits of the cross-motions for summary judgment, as well as statements of opposing and additional facts and record materials filed in support thereof, and otherwise deny it, and, for the reasons that follow, recommend that the court deny the cross-motions for summary judgment and deem the motion for a preliminary injunction moot.

## I. Threshold Issues

### A. Motion To Strike

Sea Hunters moves to strike the UK DfT's brief and statements of material facts filed in response to its motion for summary judgment, together with supporting documents, on the basis that, although the UK DfT expressed an intention at the parties' Local Rule 56(h) conference to oppose Sea Hunters' motion only on jurisdictional/legal grounds, he filed a brief that primarily

joins issue on the merits, is at best a distraction from the issues that have been properly raised, and leaves the court with little of true substance. *See* Motion To Strike at 1-2.

Much of the UK DfT's responsive brief, and the entirety of his opposing and additional statements of material facts and supporting materials, bear on the merits of the cross-motions for summary judgment. *See* UK DfT Response/Plaintiff at 9-18; UK DfT Response to Plaintiff's Statement of Material Facts in Support of Its Motion for Summary Judgment on the Intervening Complaint ("UK DfT's Opposing SMF/Plaintiff") (ECF No. 266-1), attached thereto; UK DfT Statement of Material Facts in Support of Its Opposition to Plaintiff's Motion for Summary Judgment on the Intervening Complaint ("UK DfT's Additional SMF/Plaintiff") (ECF No. 266-2), attached to UK DfT Response/Plaintiff; Exhibits filed at ECF Nos. 268-75. While the UK DfT did disclose his intention to file memoranda, opposing statements of material facts, and record materials bearing on the cross-motions for summary judgment, he expressed an intention at the Local Rule 56(h) conference to argue procedural/legal issues and did not make clear that he meant to address the merits of those motions, including the existence of factual disputes. *See* UK DfT Response to Pre-Filing Memo of Mission Recovery, LLC (ECF No. 227); UK DfT Response to Pre-Filing Memo of Plaintiff (ECF No. 228); Report of Pre-Filing Conference Under Local Rule 56(h) (ECF No. 240) at 4-6.

To permit a party unilaterally to exceed the scope of contemplated summary judgment practice obviously undercuts the utility of a Local Rule 56(h) conference. Even assuming that there might be circumstances in which the court might be inclined to overlook such a transgression, I decline to do so here. As Sea Hunters observes, *see* Motion To Strike at 3-4, the dispute sought to be resolved on summary judgment is between itself and Mission Recovery. Indeed, the UK DfT says that he takes no position on the merits. *See, e.g.*, UK DfT Response in

Opposition to Sea Hunters' Motion To Strike [DE 280] (ECF No. 285) at 7 n.4. The UK DfT's brief and statements of material facts needlessly complicate the resolution of the cross-motions while adding little of value.[1]

That said, I decline to strike the portion of the UK DfT's opposing brief bearing on the procedural/legal points that he contemplated raising, the substance of which runs from page 1 through the paragraph on page 9 ending, ". . . cannot be decided in the context of a motion for summary judgment." UK DfT Response/Plaintiff at 1-9. It is essential that the court determine whether it has jurisdiction to hear the cross-motions and whether they properly are brought pursuant to Federal Rule of Civil Procedure 56, and the UK DfT's brief assists in that analysis.

For these reasons, I grant the Motion To Strike in part, with respect to (i) the UK DfT's Opposing SMF/Plaintiff, (ii) the UK DfT's Additional SMF/Plaintiff, (iii) the exhibits filed at ECF Nos. 268-75, (iv) that portion of the UK DfT Response/Plaintiff commencing at the bottom of page 9 with the paragraph, "To the extent Sea Hunters' motion is regarded . . .," through the end of the of the full paragraph on page 18, ending with, "unforeseen circumstances will be proposed[,]" and (iv) that portion of the UK DfT Response/Plaintiff containing item (4) on page 19. The Motion To Strike is otherwise denied.

### B. Appropriateness of Cross-Motions on the Intervening Complaint

The UK DfT contends that the court should deny the cross-motions for summary judgment or, alternatively, treat them as motions for reconsideration of its prior order(s) on the ground that they are procedurally inappropriate. *See* UK DfT Response/Plaintiff at 2-9, 18-19; UK DfT Response/Intervenor at 2-17. He contends that the court lacks subject matter jurisdiction over the claims made by Mission Recovery in the Intervening Complaint because:

---

[1] For example, in contravention of Local Rule 56(c), most of the UK DfT's statements of facts denying or qualifying those of Sea Hunters fail to cite record materials. *See* UK DfT's Opposing SMF/Plaintiff.

1.      Mission Recovery has neither caused the arrest of the Port Nicholson *in rem* nor salvaged any property from the Port Nicholson and brought it into this district.  *See* UK DfT Response/Intervenor at 5-6.

2.       Mission Recovery has not served the Port Nicholson with process *in rem* or served any other party with process *in personam*, as a result of which there are no actual opposing parties and no actual cause of action upon which the court can enter judgment.  *See id.* at 2.

3.      Sea Hunters is not a party to the Intervening Complaint for the additional reason that the complaint is structured as a suit *in rem* against the Port Nicholson to foreclose on a maritime lien and advances no claim *in personam* against Sea Hunters.  *See* UK DfT Response/Plaintiff at 5.

In a similar vein, he reasons that the Intervening Complaint cannot be the subject of motions for summary judgment pursuant to Federal Rule of Civil Procedure 56, there being no "party" that can move for summary judgment and no "claim or defense" as to which summary judgment can be sought.  *See* UK DfT Response/Intervenor at 7; UK DfT Response/Plaintiff at 5; Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought.").

Nonetheless, I am satisfied that the court has jurisdiction over the subject matter presented on the cross-motions for summary judgment and that the parties have properly proceeded pursuant to Rule 56.

First, as both Mission Recovery and Sea Hunters point out, *see* Motion To Strike at 7-8; Mission Recovery LLC's Reply to Sea Hunters' Opposition and the Response of the UK DfT to Mission Recovery's Motion for Summary Judgment ("Intervenor's S/J Reply") (ECF No. 277) at

7, they are parties to this case. As Mission Recovery recognizes in the caption of its Intervening Complaint, Sea Hunters is the plaintiff, *see* Intervening Complaint at 1, and Mission Recovery became a party upon being permitted to intervene, *see* Order on Motion To Intervene (ECF No. 161) at 11. The Intervening Complaint is not a stand-alone complaint but, rather, part of the fabric of this case. Both Sea Hunters and the UK DfT, who are represented by counsel, were served that complaint through ECF. *See Block v. Toyota Motor Corp.*, 5 F. Supp.3d 1047, 1063 n.8 (D. Minn. 2014) (noting that defendants were served complaint-in-intervention through court's electronic filing system).

Second, Mission Recovery requests, *inter alia*, relief in the form of an order "that Sea Hunters no longer possesses an exclusive franchise to salvage the PORT NICHOLSON, and to award salvor in possession status to [Mission Recovery] for the reasons provided herein." Intervening Complaint ¶ 28. The cross-motions effectively seek summary judgment as to this request. *See* Plaintiff's S/J Motion at 2; Intervenor's S/J Motion at 1-2. By virtue of its already-established jurisdiction over the Port Nicholson, the court has jurisdiction over this claim. *See, e.g., Cobb Coin Co. v. Unidentified Wrecked & Abandoned Sailing Vessel*, 525 F. Supp. 186, 197 (S.D. Fla. 1981) ("[O]nce a salvor who discovers and brings up an artifact from an identifiable wreck site initiates suit by taking that object into federal court, the court acquires jurisdiction not only to adjudicate the disposition of the article already within its territorial jurisdiction, but maritime jurisdiction (based on in personam principles) to adjudicate disputes between competing salvors[.]").[2] For the same reasons, Sea Hunters and Mission Recovery properly seek summary judgment as to this claim pursuant to Rule 56. *See* Fed. R. Civ. P. 56(a).

---

[2] The UK DfT acknowledges, *see* UK DfT Response in Opposition to Sea Hunters' Motion To Strike [DE 280] (ECF No. 285) at 2-3; UK DfT Response/Intervenor at 11, that either Sea Hunters or Mission Recovery could have raised this issue by seeking the modification of prior relevant court orders; for example, Sea Hunters could have (*continued on next page*)

The cross-motions for summary judgment, therefore, are proper.

## II.  Applicable Legal Standards

### A.  Federal Rule of Civil Procedure 56

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*; *Ahmed v. Johnson*, 752 F.3d 490, 495 (1st Cir. 2014).  "A dispute is genuine if 'the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party." *Johnson v. University of P.R.*, 714 F.3d 48, 52 (1st Cir. 2013) (quoting *Thompson v. Coca-Cola Co.*, 522 F.3d 168, 175 (1st Cir. 2008)).  "A fact is material if it has the potential of determining the outcome of the litigation." *Id.* (quoting *Maymi v. P.R. Ports Auth.*, 515 F.3d 20, 25 (1st Cir. 2008)).

The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In determining whether this burden is met, the court must view the record in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences in its favor. *Johnson,* 714 F.3d at 52.  Once the moving party has made a preliminary showing that no genuine issue of material fact exists, the nonmovant must "produce specific facts, in suitable evidentiary form, to establish the presence of a trialworthy issue." *Brooks v. AIG SunAmerica Life Assur. Co.*, 480 F.3d 579, 586 (1st Cir. 2007) (quoting *Clifford v. Barnhart,* 449 F.3d 276, 280 (1st Cir. 2006) (emphasis omitted)); Fed. R. Civ. P. 56(c).  "As to any essential factual

---

sought reconsideration of the court's September 3, 2008, order declining to declare it the exclusive salvor-in-possession of the wreck but expressing willingness to reconsider that ruling "if or when Sea Hunters encounters interference with its salvage operations by persons who are subject to the jurisdiction of this Court."  Order on Motion for Preliminary Injunction (ECF No. 13).  Yet, Sea Hunters' and Mission Recovery's bid for summary judgment as to Mission Recovery's request in the Intervening Complaint to displace Sea Hunters as salvor-in-possession is the substantial equivalent.

element of its claim on which the nonmovant would bear the burden of proof at trial, its failure to come forward with sufficient evidence to generate a trialworthy issue warrants summary judgment to the moving party."  *In re Spigel*, 260 F.3d 27, 31 (1st Cir. 2001) (citation and internal punctuation omitted).

"This framework is not altered by the presence of cross-motions for summary judgment." *Cochran v. Quest Software, Inc.,* 328 F.3d 1, 6 (1st Cir. 2003). "[T]he court must mull each motion separately, drawing inferences against each movant in turn." *Id.* (citation omitted); *see also, e.g., Wightman v. Springfield Terminal Ry. Co.,* 100 F.3d 228, 230 (1st Cir. 1996) ("Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment *per se.*  Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed.  As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the [nonmovant].") (citations omitted).

### B.  Local Rule 56

The evidence that the court may consider in deciding whether genuine issues of material fact exist for purposes of summary judgment is circumscribed by the local rules of this district. *See* Loc. R. 56.  The moving party must first file a statement of material facts that it claims are not in dispute.  *See* Loc. R. 56(b).  Each fact must be set forth in a numbered paragraph and supported by a specific record citation.  *See id*.  The nonmoving party must then submit a responsive "separate, short, and concise" statement of material facts in which it must "admit, deny or qualify the facts by reference to each numbered paragraph of the moving party's statement of material facts[.]"  Loc. R. 56(c).  The nonmovant likewise must support each denial or qualification with an appropriate record citation.  *See id*.  The nonmoving party may also

submit its own additional statement of material facts that it contends are not in dispute, each supported by a specific record citation. *See id.* The movant then must respond to the nonmoving party's statement of additional facts, if any, by way of a reply statement of material facts in which it must "admit, deny or qualify such additional facts by reference to the numbered paragraphs" of the nonmovant's statement. *See* Loc. R. 56(d). Again, each denial or qualification must be supported by an appropriate record citation. *See id.*

Local Rule 56 directs that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted." Loc. R. 56(f). In addition, "[t]he court may disregard any statement of fact not supported by a specific citation to record material properly considered on summary judgment" and has "no independent duty to search or consider any part of the record not specifically referenced in the parties' separate statement of fact." *Id.*; *see also, e.g., Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010); Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion[.]").

### III.  Plaintiff's S/J Motion

### A.  Factual Background[3]

The parties' statements of material facts, credited to the extent that they are either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of Mission Recovery as the nonmovant, reveal the following.[4]

In April 2011, Daniel E. Stochel purchased five "units" in Deep Sea Hunters, LP ("Deep Sea") for $200,000.  Plaintiff's Statement of Material Facts in Support of Its Motion for Summary Judgment ("Plaintiff's SMF") (ECF No. 245-1), attached to Plaintiff's S/J Motion, ¶ 1; Mission Recovery, LLC's Statement of Material Facts in Dispute of Sea Hunters' Motion for Summary Judgment ("Intervenor's Opposing SMF") (ECF No. 259) ¶ 1.  Stochel correctly understood Deep Sea to be the "secondary offering" for investment in Sea Hunters' salvage project for the Port Nicholson after Sea Hunters became fully subscribed.  Plaintiff's SMF ¶ 2; Video Conference Deposition of Daniel E. Stochel ("Stochel Dep."), Exh. A (ECF No. 245-3) to Affidavit of Marshall J. Tinkle ("Tinkle Aff.") (ECF No. 245-2), attached to Plaintiff's S/J Motion, at 49-51.[5]

---

[3] Mission Recovery transgresses Local Rule 56(c), setting forth a number of facts solely in the body of its opposing brief rather than in a statement of additional facts.  *See* Loc. R. 56(c); Mission Recovery LLC's Memorandum of Law in Opposition to Sea Hunters' Motion for Summary Judgment ("Intervenor's S/J Opposition") (ECF No. 258) at 3-16.  This court previously has declined to consider facts that are strewn throughout the body of a brief rather than presented as required by Local Rule 56.  *See Talarico v. Marathon Shoe Co.*, 221 F. Supp.2d 35, 39 n.1 (D. Me. 2002).  I do the same here.  This rule transgression deprives the movant of the opportunity to admit, deny, or qualify the nonmovant's statements, and the court of the benefit of the movant's response.

[4] Statements that are qualified are assumed to be admitted subject to that qualification, unless a qualification indicates otherwise.  To the extent that I have taken into consideration a denial of a statement, I have determined that the denial is supported by the citation(s) given.

[5] Mission Recovery purports to deny this, Intervenor's Opposing SMF ¶ 2, but its assertion is in the nature of a qualification: that Stochel expected that the proceeds of his subscription would be directed to the salvage of the Port Nicholson and that, as a result, Deep Sea and Sea Hunters were engaged in a common enterprise, but not that they were one and the same entity, Affidavit of Daniel E. Stochel ("Stochel Aff."), Exh. 1 (ECF No. 259-1) to Intervenor's Opposing SMF, ¶¶ 2-5.

Before investing in the Sea Hunters salvage venture, Stochel had received and reviewed the "Confidential Offering Summary," containing confidential information relating to the project. Plaintiff's SMF ¶ 3; Stochel Dep. at 53-54; Stochel Dep. Exh. 27, appended thereto.[6] Stochel read all of the said document, including page 96, before he made his investment. Plaintiff's SMF ¶ 4; Intervenor's Opposing SMF ¶ 4.[7] Page 96 states:

**IMPORTANT**

**DO NOT READ PAST THIS POINT IF YOU HAVE NOT
ALREADY AGREED TO AND SIGNED A
CONFIDENTIALITY & NON-COMPETE AGREEMENT
WITH SUB SEA RESEARCH LLC AND/OR DEEP SEA HUNTERS L.P.**

*Id*. ¶ 6.[8] Stochel read all of the "Limited Partnership Offering Summary" beginning on page 97 of said document. *Id*. ¶ 7. Before investing, he read and signed the Confidential Subscription Agreement. *Id*. ¶ 8. Section 3.8.6 of the Confidential Subscription Agreement provides:

> The Subscriber has agreed to and signed a separate Confidentiality and Non-Compete Agreement, which he will honor and which he will not contest regardless of whether or not the Subscriber's subscription is accepted, and, if accepted, regardless of whether or not, the Subscriber retains or disposes of the Unit(s) so subscribed.

*Id*. ¶ 9.[9] Section 5 of the Confidential Subscription Agreement provides:

> INDEMNIFICATION. The Subscriber acknowledges that it understands the meaning and legal consequences of the representations and warranties contained herein and hereby agrees to indemnify and hold harmless the General Partner and

---

[6] Mission Recovery purports to deny this statement but fails to controvert it, instead, in effect, interposing an objection. Intervenor's Opposing SMF ¶ 3. It complains that the statement is conclusory in that it assumes that the offering summary contained confidential information merely because it was so captioned. *Id*. Its objection is overruled. In the cited portion of the Stochel deposition, Stochel testified that he understood the offering summary to be confidential. Stochel Dep. at 54.

[7] I omit Plaintiff's SMF ¶ 5, which is neither admitted nor supported by the record citation given.

[8] Mission Recovery qualifies this statement, Intervenor's Opposing SMF ¶ 6, asserting that this does not mean that Stochel signed a Confidentiality and Non-Compete Agreement with either Sub Sea Research, LLC ("Sub Sea Research") and/or Deep Sea, Stochel Dep. at 55. I omit its further assertions, Intervenor's Opposing SMF ¶ 6, which are in the nature of legal arguments.

[9] Mission Recovery qualifies this statement, Intervenor's Opposing SMF ¶ 9, asserting that Stochel neither received nor signed such a document, Stochel Aff. ¶ 11. I omit its further assertions, Intervenor's Opposing SMF ¶ 9, which are in the nature of legal arguments.

the "Partnership" from and against any and all loss (including attorney's fees, damage or liability due to or arising out of a breach of any representation, warranty, or covenant of the Subscriber contained in this Agreement.

*Id.* ¶ 10.

Stochel signed the Limited Partnership Agreement as a limited partner on or about April 15, 2011. *Id.* ¶ 11. Stochel had read the Limited Partnership Agreement thoroughly before signing it and understood all of its provisions. Plaintiff's SMF ¶ 12; Stochel Dep. at 63-64.[10] At the time, Stochel owned (through a solely owned LLC) and ran – and still owns and runs – an investment company called Equitron Capital, LP. Plaintiff's SMF ¶ 13; Stochel Dep. at 20-23.[11] Stochel also works as a business consultant through his company, Equitron Capital Advisors. Plaintiff's SMF ¶ 14; Stochel Dep. at 20-23.[12] Stochel earned a university degree in business administration in 1984. Plaintiff's SMF ¶ 15; Intervenor's Opposing SMF ¶ 15. He had signed several business agreements in the past. *Id.* ¶ 16.

Paragraph 4.2 of the Limited Partnership Agreement provides, in part:

Any Limited Partner may engage in any other profession or business of any nature and description independently or with others, provided such activity is not competitive with the Partnership's business and provided it does not cause a breach of the Confidentiality and Non-Compete Agreement signed between the Limited Partners and DEEP SEA HUNTERS L.P.

---

[10] Mission Recovery purports to deny this statement, Intervenor's Opposing SMF ¶ 12, but its assertion is in the nature of a qualification: that Stochel modified his response to the question of whether he understood all of the provisions of the agreement, stating, "To my knowledge, yes[,]" Stochel Dep. at 64.

[11] Mission Recovery purports to deny this statement, Intervenor's Opposing SMF ¶ 13, asserting that Stochel does not own and has not stated that he owns Equitron Capital, LP, but rather owns Equitron Capital Management, LLC, which is the general partner and manager of Equitron Capital, LP, Stochel Aff. ¶ 6. However, this is consistent with Sea Hunters' assertion that Stochel owns Equitron Capital, LP, "through a solely owned LLC[.]" Plaintiff's SMF ¶ 13.

[12] I omit Sea Hunters' further assertion that Stochel works as a business consultant "for investors[,]" Plaintiff's SMF ¶ 14, which Mission Recovery denies, Intervenor's Opposing SMF ¶ 14, viewing the evidence in the light most favorable to Mission Recovery as nonmovant.

*Id.* ¶ 17. Stochel had specifically read the above provision before he signed the Limited Partnership Agreement. *Id.* ¶ 18.[13] The business of the limited partnership is described in the Limited Partnership Agreement as including search and salvage operations in and around the waters of the United States of America. Plaintiff's SMF ¶ 19; Stochel Dep. Exh. 27 at 119.[14]

Section 5.4 of the Limited Partnership Agreement provides: "No Partner shall be entitled to withdraw any capital or receive any distribution from the Partnership, except as specifically provided in this Agreement." Plaintiff's SMF ¶ 20; Intervenor's Opposing SMF ¶ 20. Section 7.2 of the agreement provides for the allocation of net income to each limited partner. *Id.* ¶ 21. Section 11.1 of the agreement states in part: "Unless sooner terminated as provided in Article X or this Article XI, the Partnership shall continue until December 31, 2015, unless extended by the General Partner." *Id.* ¶ 22.[15]

If Sea Hunters were now to bring up treasure from the Port Nicholson, Stochel would "absolutely" expect a share in the recovery in accordance with his partnership interest. *Id.* ¶ 27.[16] Stochel never received permission from Sea Hunters or Deep Sea to compete with Sea Hunters or not keep its documents confidential. Plaintiff's SMF ¶ 28; Stochel Dep. at 56-57.[17] After becoming a limited partner, Stochel received periodic updates on the Sub Sea Research web site to which he had access via a confidential password. Plaintiff's SMF ¶ 29; Intervenor's

---

[13] Mission Recovery qualifies paragraphs 17 and 18, Intervenor's Opposing SMF ¶¶ 17-18, asserting that Stochel neither received nor signed a Confidentiality and Non-Compete Agreement, Stochel Aff. ¶ 11.

[14] Mission Recovery purports to deny this statement, Intervenor's Opposing SMF ¶ 19, but its assertion is in the nature of a qualification: that the business of the limited partnership, as stated on page 3 of a *different* document, the Deep Sea Offering Summary, is to purchase a submarine, Exh. 7 (ECF No. 259-7) to Intervenor's Opposing SMF.

[15] I omit Sea Hunters' statements that Deep Sea's and Sea Hunters' general partner is Sub Sea Research, Plaintiff's SMF ¶¶ 23-24, which Mission Recovery denies, Intervenor's Opposing SMF ¶¶ 23-24, viewing the evidence in the light most favorable to Mission Recovery as nonmovant.

[16] I omit Mission Recovery's qualification, Intervenor's SMF ¶ 27, which is unsupported by any record citation.

[17] Mission Recovery purports to deny this, Intervenor's Opposing SMF ¶ 28, but its assertion is in the nature of a qualification: that, other than certain limited and incomplete financial records, Sea Hunters has not provided any documents to Stochel that are confidential, Stochel Aff. ¶¶ 7-10.

Opposing SMF ¶ 29.[18]  Stochel received confidential financial records from Gregory Brooks, a manager and general partner of Sea Hunters.  Plaintiff's SMF ¶ 32; Intervenor's Opposing SMF ¶ 32.[19]  The great majority of documents and information that Stochel received pertaining to the Port Nicholson came from Brooks, Edward Michaud (Sea Hunters' researcher), or Sea Hunters' web sites.  *Id*. ¶ 33.[20]

In an email dated March 4, 2013, Stochel indicated that he would be reviewing information provided by Sea Hunters with his investor group and stated:

> We will be able to support you financially in the best way possible with the joint goal of retrieving the PN's valued cargo.

> You have our complete support, and we will coordinate soon.

> You have my word.

*Id*. ¶ 35.  On March 6, 2013, Stochel sent Brooks an "initial general outline" of a "serious proposal" to form a joint venture between Sea Hunters and "Equitron or another investment-based LLC formed specific to this concept" to cover the costs of the salvage operation.  *Id*. ¶ 36. Stochel had previously decided to form Mission Recovery.  *Id*. ¶ 37.  Stochel formed Mission Recovery on March 12, 2013.  *Id*. ¶ 38.[21]  Stochel formed Mission Recovery for the express purpose of salvaging the Port Nicholson.  *Id*. ¶ 40.  Stochel never asked for or received consent from Sea Hunters or Deep Sea to form his own treasure salvage company.  *Id*. ¶ 41.  After

---

[18] I omit Sea Hunters' statements that Stochel received confidential documents from Sea Hunters concerning the history and cargo of the Port Nicholson, Plaintiff's SMF ¶¶ 30-31, and in February, March, and April 2013, he asked for and received additional confidential documents from Sea Hunters' agents, including Brooks and Michaud, *id.* ¶ 34, which Mission Recovery denies, Intervenor's Opposing SMF ¶¶ 30-31, 34, viewing the evidence in the light most favorable to Mission Recovery as nonmovant.
[19] Mission Recovery qualifies this statement, Intervenor's Opposing SMF ¶ 32, asserting that the records that Stochel received were limited and incomplete, Stochel Aff. ¶ 8.
[20] Mission Recovery qualifies this statement, Intervenor's Opposing SMF ¶ 33, asserting that none of the information received from any of these sources, save certain limited and incomplete financial records of Deep Sea and other entities managed by Brooks, was confidential or not otherwise in the public domain, Stochel Aff. ¶¶ 7-10.
[21] I omit Sea Hunters' statement that Stochel is and always has been the sole member of Mission Recovery, Plaintiff's SMF ¶ 37, which Mission Recovery denies, Intervenor's Opposing SMF ¶ 37, viewing the evidence in the light most favorable to Mission Recovery as nonmovant.

Stochel formed Mission Recovery but before May 2013, he caused to be drafted a "subscription agreement" for Mission Recovery. *Id.* ¶ 42.[22] The subscription agreement provided that Mission Recovery might require the subscriber to deliver the agreed investment after:

> (c)     The first to occur of the following:
>
> > (i)     a court of competent jurisdiction appoints the Company or its affiliate as Substitute Custodian in respect of the shipwreck known as the "Port Nicholson" (the "Target Vessel"); or
> >
> > (ii)    The Company enters into a joint venture or similar agreement with a person or entity that has been declared by a court of competent jurisdiction as Substitute Custodian (whether solely or jointly with a third party) of the Target Vessel.

*Id.* ¶ 43. Stochel arranged a meeting with Brooks for May 21, 2013, to discuss Stochel's proposal further. *Id.* ¶ 44. At that meeting, Stochel presented Sea Hunters' representatives with a "term sheet." *Id.* ¶ 45. The term sheet proposed a joint venture between Mission Recovery and Sea Hunters' general partner, Sub Sea Research, LLC, to conduct and manage the salvage of the submerged contents and cargo of the Port Nicholson. *Id.* ¶ 46. The term sheet states that "Mission Recovery shall have a seventy-five percent (75%) interest in the Joint Venture and in the profits . . . ." Plaintiff's SMF ¶ 47; Stochel Dep. Exh. 106, attached to Stochel Dep., at 2.[23] The term sheet does not state what amount Mission Recovery will contribute to the joint venture.

---

[22] Mission Recovery qualifies paragraphs 40, 41, and 42, Intervenor's Opposing SMF ¶¶ 40-42, asserting that Stochel testified that he initially formed Mission Recovery in an attempt to assist Sea Hunters in salvaging the Port Nicholson and that the subscription agreement was drafted for the same purpose, Stochel Dep., Exh. 11 (ECF No. 259-11) to Intervenor's Opposing SMF, at 82-84; Stochel Dep., Exh. 12 (ECF No. 259-12) to Intervenor's Opposing SMF, at 137.

[23] Mission Recovery purports to deny this statement, Intervenor's Opposing SMF ¶ 47, but its assertion is in the nature of a qualification: that Stochel revised the offer to reduce Mission Recovery's interest to 45 percent, Affidavit of Daniel E. Stochel ("Second Stochel Aff."), Exh. 13 (ECF No. 259-13) to Intervenor's Opposing SMF, ¶ 10.

Plaintiff's SMF ¶ 48; Stochel Dep. Exh. 106.[24]  Sea Hunters rejected Stochel's proposal on May 31, 2013.  Plaintiff's SMF ¶ 49; Intervenor's Opposing SMF ¶ 49.

In the first half of June 2013, Stochel had his attorney draft a letter of support for Mission Recovery.  *Id.* ¶ 50.[25]  Stochel asked certain investors in Sea Hunters and/or Deep Sea to sign the letter.  Plaintiff's SMF ¶ 51; Stochel Dep. at 128; Stochel Dep. Exh. 107, attached thereto.[26]  The letter is addressed to Stochel and states in part that "we welcome the opportunity to participate in such recovery through a better capitalized, more competent salvor such as you have organized in Mission Recovery."  Plaintiff's SMF ¶ 52; Intervenor's Opposing SMF ¶ 52.  Stochel obtained signatures to the said letter from certain of Sea Hunters' investors on or about June 15 and 16, 2013.  Plaintiff's SMF ¶ 53; Stochel Dep. at 128.[27]  Mission Recovery filed its motion to intervene on June 21, 2013.  Plaintiff's SMF ¶ 54; Intervenor's Opposing SMF ¶ 54.  In May 2013, Stochel tried to get several investors in Sea Hunters and/or its affiliates to invest in Mission Recovery.  Plaintiff's SMF ¶ 55; Affidavit of Robert Jesse Kunitz ("Kunitz Aff."), contained in Exh. B (ECF No. 151-2) to Sea Hunters, LP's Objection to Mission Recovery, LLC Motion To Intervene ("Plaintiff's Intervention Objection") (ECF No. 151), ¶¶ 2-3; Affidavit of William Gellman ("Gellman Aff."), contained in Exh. B to Plaintiff's Intervention Objection,

---

[24] Mission Recovery purports to deny this statement, Intervenor's Opposing SMF ¶ 48, but its assertion is in the nature of a qualification: that the term sheet stated that it would contribute sufficient working capital to accomplish the goals of conducting a project survey to recover or obtain conclusive video evidence of precious metals, engage a reputable and experienced marine salvage firm to recover target property, and pay reasonable attorney fees in respect of litigation involving adverse or competing claims, Stochel Dep. Exh. 106.

[25] Mission Recovery qualifies this statement, Intervenor's Opposing SMF ¶ 50, asserting that Stochel asked his attorney to draft the letter after Rob Muchnik reached out to him and he was invited by other Sea Hunters/Deep Sea investors to discuss the situation in a conference call, Stochel Dep. at 127-30.

[26] Mission Recovery purports to deny this, Intervenor's Opposing SMF ¶ 51, but its assertion is in the nature of a qualification: that Stochel made clear in his testimony that he was invited to participate in a conference call with Sea Hunters/Deep Sea investors and that they signed the letters of their own accord, Stochel Dep. at 127-30.

[27] Mission Recovery purports to deny this, Intervenor's Opposing SMF ¶ 53, but its assertion is in the nature of a qualification: that one of the investors signed a letter to Stochel dated July 3, 2013, Exh. 16 (ECF No. 259-16) to Intervenor's Opposing SMF.

¶¶ 2-3.[28]  Stochel asked such investors to sign an agreement that effectively would have precluded them from working with Sea Hunters and its affiliates.  Plaintiff's SMF ¶ 56; Kunitz Aff. ¶ 4; Gellman Aff. ¶ 4.[29]  None of the investors in Sea Hunters and its affiliates became investors in Mission Recovery.  Plaintiff's SMF ¶ 57; Intervenor's Opposing SMF ¶ 57.[30] Stochel has no experience of any kind with salvage operations, apart from his investment in Sea Hunters' operations. *Id.* ¶ 59.

## B.  Discussion

Sea Hunters seeks summary judgment on the Intervening Complaint on the basis that Mission Recovery is barred as a matter of law from attempting to displace Sea Hunters as salvor-in-possession of the Port Nicholson because its principal, Stochel, pledged as a limited partner of Deep Sea not to compete with Deep Sea's business, which includes undersea salvage.  *See* Plaintiff's S/J Motion at 4-5.

Mission Recovery opposes the motion on the grounds that there are genuine disputes of material fact as to whether Stochel covenanted not to compete against Sea Hunters and, even assuming that he did, any such covenant is unenforceable as a matter of law because Sea Hunters does not have a legitimate business interest to protect, Stochel does not owe a duty of loyalty to Sea Hunters, and Sea Hunters' and its affiliates' bad faith and breach of their duties to investors

---

[28] Mission Recovery purports to deny this, Intervenor's Opposing SMF ¶ 55, but its assertion is in the nature of a qualification: that Stochel spoke with a few select investors, only for the purpose of organizing a joint venture to assist Sea Hunters in salvaging the Port Nicholson, and never sought to limit any person's continued investment in Sea Hunters, Stochel Aff. ¶ 12.

[29] Mission Recovery purports to deny this, Intervenor's Opposing SMF ¶ 56, but its assertion is in the nature of a qualification: that Stochel did not seek to preclude any Sea Hunters investor from continuing to invest with Sea Hunters, Stochel Aff. ¶ 12.

[30] I omit Sea Hunters' statement that Stochel's actions in seeking to supplant it as salvor-in-possession created a substantial disturbance to the salvage recovery project and interfered with additional financing arrangements, Plaintiff's SMF ¶ 58, which Mission Recovery denies, Intervenor's Opposing SMF ¶ 58, viewing the evidence in the light most favorable to Mission Recovery as nonmovant.

have excused whatever obligation Stochel otherwise would have had. *See* Intervenor's S/J Opposition at 2.

I agree that there is a genuine issue of material fact concerning whether Stochel covenanted not to compete against Sea Hunters. Accordingly, I recommend that Sea Hunters' bid for summary judgment be denied. I do not reach Mission Recovery's alternative arguments for the denial of the motion.[31]

As Sea Hunters points out, *see* Plaintiff's S/J Motion at 5, "where [contract] language is unambiguous, contract interpretation is a question of law for the court, where ambiguous, it is a question of fact for the jury[,]" *Tate & Lyle Ingredients Americas, Inc. v. Transport Distrib., LLC*, 746 F. Supp.2d 189, 195 (D. Me. 2010). "Contract language is ambiguous if the terms are inconsistent on their face, or if the terms allow reasonable but differing interpretations of their meaning." *Id*. at 195-96. (citation and internal punctuation omitted). "The initial determination of whether the language is ambiguous is a question of law for the court." *Id*. at 196.[32]

---

[31] I understand Sea Hunters to seek summary judgment solely on the basis that Stochel's covenant not to compete with Deep Sea's business bars Mission Recovery's bid to salvage the Port Nicholson. However, to the extent that Sea Hunters argues, in the alternative, that Mission Recovery is barred by its use of confidential information obtained by Stochel as a limited partner of Deep Sea, *see* Plaintiff's S/J Motion at 7, it fails to demonstrate entitlement to summary judgment on that basis on the showing made. As Mission Recovery points out, *see* Intervenor's S/J Opposition at 6, Sea Hunters does not specify what confidential information was used and in what manner. In addition, Mission Recovery denies that Stochel possessed any confidential information of Sea Hunters apart from limited financial information. *See, e.g.*, Intervenor's Opposing SMF ¶¶ 30-31, 34; Stochel Aff. ¶¶ 7-10.

[32] Although the point is not addressed by the parties, it appears that Stochel's agreement with Deep Sea is a maritime contract. *See Williamson v. Recovery Ltd. P'ship*, 542 F.3d 43, 49 (2d Cir. 2008) (observing that, in determining whether a contract is maritime, "the proper inquiry is whether the principal objective of a contract is maritime commerce"; deeming covenants not to compete, non-disclosure agreements, and agreement to provide technical equipment in exchange for percentage of salvage recovery "clearly salty") (citations and internal quotation marks omitted). "[O]nce a contract has been deemed a maritime contract, the next step is determining whether a specific state's laws should be used to *supplement* any area of contract law for which federal common law does not provide." *Id*. (emphasis in original). The rules for the construction and interpretation of maritime contracts are essentially the same as those delineated in the non-maritime caselaw cited by Sea Hunters, which I have set forth above. *See, e.g.*, *International Marine, LLC v. Delta Towing LLC*, Civil Action No. 10-0044, 2014 WL 2938351, at *10 (E.D. La. June 30, 2014) ("When interpreting a maritime contract, the general rules of contract construction and interpretation apply. Thus, the terms of a contract should be given their plain meaning unless the provision is ambiguous. A contract is not ambiguous if its language as a whole is clear, explicit, and leads to no absurd consequences, and as such it can be given only one reasonable interpretation.") (citations and internal quotation marks omitted).

Sea Hunters argues that Stochel's pledge not to engage in activity "competitive with the Partnership" is unambiguous and that no reasonable factfinder could conclude that, by forming a company whose sole purpose was to seek to salvage precisely the same prize that Sea Hunters and Deep Sea had been organized to recover, he was not engaged in activity competitive with the partnership. *See* Plaintiff's S/J Motion at 5. However, I conclude that the contract language upon which Sea Hunters relies is ambiguous and that its motion for summary judgment should be denied.

Stochel denies that he received or signed a Confidentiality and Non-Compete Agreement, *see* Intervenor's Opposing SMF ¶¶ 17-18; Stochel Aff. ¶ 11, and Sea Hunters fails to produce any evidence that he did. Sea Hunters' evidence does demonstrate that Stochel agreed not to engage in a profession or business "competitive with [Deep Sea's] business." Plaintiff's SMF ¶ 17; Intervenor's Opposing SMF ¶ 17. In turn, the Limited Partnership Agreement defines Deep Sea's business as including search and salvage operations in and around the waters of the United States of America. *See* Plaintiff's SMF ¶ 19; Stochel Dep. Exh. 27 at 119. However, these provisions on their face do not unambiguously make clear that Stochel agreed not to compete with search and salvage operations undertaken by Sea Hunters, a separate entity. In any event, the Confidential Offering Summary describes Deep Sea's business as the purchase of a submarine. *See* Intervenor's Opposing SMF ¶ 19; Exh. 7 thereto. Sea Hunters does not argue, or point to evidence indicating, that the Limited Partnership Agreement was a fully integrated contract, superseding representations made to the contrary in other transactional documents such as the Confidential Offering Summary.

These ambiguities in Deep Sea's transactional documents forestall summary judgment in Sea Hunters' favor.[33]

## IV. Intervenor's S/J Motion

### A. Factual Background[34]

The parties' statements of material facts, credited to the extent that they are either admitted or supported by record citations in accordance with Local Rule 56, with disputes resolved in favor of Sea Hunters as the nonmovant, reveal the following.[35]

Sea Hunters was appointed substitute custodian of the Port Nicholson on August 25, 2008. Summary of Undisputed Material Facts ("Intervenor's SMF"), commencing on page 2 of Intervenor's S/J Motion, ¶ 1; Plaintiff's Opposing SMF ¶ 1. Sea Hunters has not recovered any cargo items of any significant value from the Port Nicholson since being appointed substitute custodian. Intervenor's SMF ¶ 2; Status Report of Sea Hunters, LP ("7/7/09 Status Report")

---

[33] In its reply brief, Sea Hunters contends, in the alternative, that it was an intended beneficiary of Stochel's non-compete agreement. *See* Plaintiff's Reply to Mission Recovery LLC's Memorandum of Law in Opposition to Sea Hunters' Motion for Summary Judgment (ECF No. 278) at 6-7. This argument, which could have been, but was not, set forth as a basis for its motion, and to which the court lacks the benefit of a response, is waived for purposes of summary judgment. *See, e.g., In re One Bancorp Sec. Litig.,* 134 F.R.D. 4, 10 n.5 (D. Me. 1991) (court generally will not address an argument advanced for the first time in a reply memorandum).

[34] The UK DfT filed a response to Mission Recovery's statement of material facts, as well as one additional statement of fact. *See* UK DfT Response to Mission Recovery Summary of Undisputed Facts and Statement of Additional Facts (ECF No. 261). Because this filing addresses issues beyond those that the UK DfT expressed an intention to address during the parties' Local Rule 56(h) conference, needlessly complicates the adjudication of the cross-motions, and adds little of value, I have declined to consider it. I have also ignored a number of impermissible responses by Mission Recovery. Mission Recovery transgresses Local Rule 56(b) by setting forth a number of facts solely in the body of its brief. *See* Loc. R. 56(b); *compare* Intervenor's S/J Motion at 2-4 *with id.* at 10-17. I decline to consider those facts. *See Talarico,* 221 F. Supp.2d at 39 n.1. Mission Recovery also transgresses Local Rule 56(d). While it permissibly responds to Sea Hunters' requests to strike, *see* Loc. R. 56(e); *compare* Responses ("Plaintiff's Opposing SMF"), commencing on page 1 of Plaintiff's Response to Mission Recovery Statement of Material Facts and Plaintiff's Additional Statement of Material Facts ("Plaintiff's SMFs") (ECF No. 264), ¶¶ 2, 8-10 *with* Response to Sea Hunter[s]' Objections to Undisputed Facts Submitted by Mission Recovery ("Intervenor's Obj. Resp."), commencing on page 1 of Mission Recovery LLC's Reply to Sea Hunters' Response to Mission Recovery's Statement of Material Facts and Sea Hunters' Statement of Additional Facts ("Intervenor's Obj. Resp. & Reply SMF") (ECF No. 279), ¶¶ 2, 8-9, it also impermissibly responds to the substance of most of Sea Hunters' opposing statements, *see* Loc. R. 56(d); Intervenor's Obj. Resp. ¶¶ 1, 3-7, 9-10. Substantive responses are permitted only to a nonmovant's additional statement of material facts. *See* Loc. R. 56(d).

[35] Statements that are qualified are assumed to be admitted subject to that qualification, unless a qualification indicates otherwise. To the extent that I have taken into consideration a denial of a statement, I have determined that the denial is supported by the citation(s) given.

(ECF No. 24); Joint Status Report ("11/9/09 Status Report") (ECF No. 28); Joint Status Report

("5/11/10 Status Report") (ECF No. 30); Joint Status Report ("11/12/10 Status Report") (ECF

No. 32); Joint Status Report ("5/16/11 Status Report") (ECF No. 34); Joint Status Report

("11/17/11 Status Report") (ECF No. 37); Joint Status Report ("6/19/12 Status Report") (ECF

No. 56); Plaintiff, Sea Hunters, LP Status Report ("11/19/12 Status Report") (ECF No. 93);

Status Report ("8/29/13 Status Report") (ECF No. 157); Plaintiff's Status Report ("2/11/14

Status Report") (ECF No. 190).[36]  Sea Hunters did not report the recovery of any items from the

Port Nicholson in 2012 and 2013.  Intervenor's SMF ¶ 3; 6/19/12 Status Report; 11/19/12 Status

Report; 8/29/13 Status Report.[37]  Sea Hunters made only two trips to the wreck site of the Port

Nicholson in 2013.  Intervenor's SMF ¶ 4; Plaintiff's Opposing SMF ¶ 4.[38]

    In April 2011, Stochel and a limited partnership managed by him invested an aggregate

of $600,000 in Deep Sea for the purpose of providing the necessary capital to salvage the Port

Nicholson.  *Id.* ¶ 6.[39]  Mission Recovery was formed for the purpose of salvaging the Port

Nicholson.  *Id.* ¶ 7.[40]

---

[36] Sea Hunters' objection to this statement on the ground that it is unsupported by record citations and conclusory, Plaintiff's Opposing SMF ¶ 2, is overruled.  As Mission Recovery notes, Intervenor's Obj. Resp. ¶ 2, Sea Hunters itself has given an inventory of the items recovered from the Port Nicholson (I count six rather than five, as stated by Mission Recovery), none of which is claimed to be "cargo[,]" Exh. B (ECF No. 178-2) to Plaintiff's Status Report ("12/6/13 Status Report") (ECF No. 178).  Sea Hunters alternatively purports to deny the statement, Plaintiff's Opposing SMF ¶ 2; however, it points to affidavits expressing the opinion that some recovered items such as a ship's compass have significant value, Affidavit of Gregory Brooks ("Brooks Aff.") (ECF No. 264-5), attached to Plaintiff's SMFs, ¶ 42; Affidavit of Donald Rodocker ("Rodocker Aff.") (ECF No. 264-9), attached to Plaintiff's SMFs, ¶ 21.  A ship's compass is not cargo.

[37] Sea Hunters purports to deny this, Plaintiff's Opposing SMF ¶ 3; however, its denial is unsupported by four of the five items cited, and a fifth item, a DVD filed on January 11, 2013, is damaged and unplayable.  Assuming *arguendo* that the January 11, 2013, DVD supports Sea Hunters' denial, nothing turns on it, inasmuch as I conclude that even taking into account Mission Recovery's assertion that Sea Hunters reported the recovery of no items in 2012 and 2013, its motion for summary judgment should be denied.

[38] I omit Mission Recovery's statement that Sea Hunters has no money, Intervenor's SMF ¶ 5, which Sea Hunters denies, Plaintiff's Opposing SMF ¶ 5, viewing the evidence in the light most favorable to Sea Hunters as nonmovant.

[39] Sea Hunters qualifies this statement, Plaintiff's Opposing SMF ¶ 6, asserting that Stochel personally invested $200,000, an additional $400,000 came from Equitron Capital Management, LLC, which is not a limited (*continued on next page*)

Brooks, who is Sea Hunters' general manager, has been in the marine salvage business since the early 1990s. Plaintiff's Additional Statement of Material Facts ("Plaintiff's Additional SMF"), commencing on page 3 of Plaintiff's SMFs, ¶ 1; Mission Recovery's Response to Sea Hunter[s]' Statement of Additional Material Facts ("Intervenor's Reply SMF"), commencing on page 3 of Intervenor's Obj. Resp. & Reply SMF, ¶ 1. He has owned many vessels and a variety of pieces of salvage equipment, including for a substantial number of years a remotely operated underwater vehicle ("ROV"). Plaintiff's Additional SMF ¶ 2; Brooks Aff. ¶ 2.[41] As is very common in the salvage industry, Brooks learned the salvage business over many years by actively salvaging in a variety of locations with various pieces of equipment; he also learned a lot by reading about salvage and by talking to and getting to know a large number of people in the salvage business through networking. Plaintiff's Additional SMF ¶ 3; Brooks Aff. ¶ 3. He has learned over many years that the salvage business is one that is learned in a variety of ways, including not only active experience, reading, and networking but also by careful and thoughtful

_____

partnership, and these amounts represent less than 8 percent of the capital that has been used in Sea Hunters' salvage project, Stochel Dep. at 53, 62; Brooks Aff. ¶¶ 9, 11, 18, 21-22; Rodocker Aff. ¶ 15.

[40] I omit Mission Recovery's statements that (i) it has obtained $15 million in financing commitments to complete the salvage of the Port Nicholson, Intervenor's SMF ¶ 8, (ii) Swire Seabed AS ("Swire") is an experienced deepwater salvage firm, *id*. ¶ 9, and (iii) Mission Recovery has an agreement with Swire to effect the salvage of the Port Nicholson, *id*. ¶ 10. With respect to paragraph 8, I sustain Sea Hunters' objection that Mission Recovery relies on an unauthenticated document with no visible signatures. Plaintiff's Opposing SMF ¶ 8. Mission Recovery responds that it provided Sea Hunters a copy of the document containing the signatures and redacted them on the ECF docket in accordance with this court's Order Regarding Certain Disclosures (ECF No. 211). Intervenor's Obj. Resp. ¶ 8. However, this does not address the thrust of the objection, that the document is unauthenticated. With respect to paragraph 9, I sustain Sea Hunters' objection, Plaintiff's Opposing SMF ¶ 9, that Mission Recovery relies on an unauthenticated document containing inadmissible hearsay. Mission Recovery responds that Stochel confirmed under oath that the brochure at issue was provided directly to him by Swire. Intervenor's Obj. Resp. ¶ 9. However, even assuming that this authenticates the document, it does not address Mission Recovery's reliance on hearsay – statements made by a declarant out of court (in the brochure) that are offered to prove the truth of the matter asserted. Fed. R. Evid. 801(c). With respect to paragraph 10, I sustain Sea Hunters' objection, Plaintiff's Opposing SMF ¶ 10, that Mission Recovery relies on an unauthenticated document, lacking proper foundation. Mission Recovery's response addresses Sea Hunters' denial in the alternative of the statement, but not its objection. Intervenor's Obj. Resp. ¶ 10.

[41] In this and many other instances, Mission Recovery purports to deny or qualify Sea Hunters' statements but offers statements or arguments that are unsupported by record citations and do not appear to be objections/requests to strike. Intervenor's Reply SMF ¶¶ 2-3, 11-12, 14, 17-18, 20-22, 25, 27, 31-35, 37, 42-48, 50, 54, 58, 62, 67-68, 70-73, 76-77, 79, 94, 103. I ignore these responses.

trials of combinations of technology that appear to have a reasonable prospect of success. Plaintiff's Additional SMF ¶ 4; Intervenor's Reply SMF ¶ 4.[42]

Brooks heard about the Port Nicholson from Terry Kelley of Australia in approximately 2006-07. *Id*. ¶ 7. He then contacted Edward Michaud, a researcher with whom he had previously worked, and paid for Kelley and Michaud to come to Maine and meet. *Id*. ¶ 8. That meeting led to Brooks' efforts to find the Port Nicholson. *Id*. ¶ 9. In 2007 and 2008, these efforts were based upon limited and sketchy information suggesting approximate location and possible valuable cargo, not upon any certainty as to the location or contents of the wreck. *Id*. ¶ 10. With initial financing of $125,000 from Brooks and his long-time partner John Hardy, since deceased, Brooks and Hardy looked over a large area of ocean floor off of the coast of Maine and Massachusetts. Plaintiff's Additional SMF ¶ 11; Brooks Aff. ¶ 9. Using data from multiple sources, they made dozens of trips to the area of the reported sinking of the Port Nicholson and searched an area of approximately 125 square miles of ocean. Plaintiff's Additional SMF ¶ 12; Brooks Aff. ¶ 9. They eventually identified the remains of a vessel that was the approximate size of the lost Port Nicholson, reported the finding to this court, and commenced this action. Plaintiff's Additional SMF ¶ 13; Intervenor's Reply SMF ¶ 13.

With only limited information, Sea Hunters undertook to raise funds for initial attempts to survey and, to the extent possible, recover items from the identified wreck site. Plaintiff's Additional SMF ¶ 14; Brooks Aff. ¶ 10. Efforts during this initial period included raising approximately $5 million from a substantial number of investors in 2008 and 2009. Plaintiff's Additional SMF ¶ 15; Intervenor's Reply SMF ¶ 15. These investors were warned of the risks

---

[42] I omit paragraphs 5 and 6, Plaintiff's Additional SMF ¶¶ 5-6, sustaining Mission Recovery's objection, Intervenor's Reply SMF ¶¶ 5-6, that, as worded, they are argumentative rather than factual.

involved in the salvage venture.  Plaintiff's Additional SMF ¶ 16; Brooks Aff. ¶ 11 & Exh. A (ECF No. 264-6) to Plaintiff's SMFs.[43]

Sea Hunters assembled a skilled crew and hired other independent contractors such as researchers.  Plaintiff's Additional SMF ¶ 17; Brooks Aff. ¶ 12.  As is typical in the industry, Sea Hunters' contracts with crew members and other contractors called for them to receive a portion of any eventual recovery as a significant part of their compensation.  Plaintiff's Additional SMF ¶ 18; Brooks Aff. ¶ 12.

The vessel that was eventually named "Sea Hunter" was acquired in 2008 and was substantially renovated, refurbished, and improved, including extensive work on equipment throughout the vessel, such as winches, motors, and electrical equipment.  Plaintiff's Additional SMF ¶ 19; Intervenor's Reply SMF ¶ 19.  The initial acquisition and refurbishing cost eventually exceeded $2 million of the $5 million acquired from investors.  Plaintiff's Additional SMF ¶ 20; Brooks Aff. ¶ 13.  Many of the repairs and upgrades were done by Sea Hunters' crew.  Plaintiff's Additional SMF ¶ 21; Brooks Aff. ¶ 13.  The purpose of the upgrades was to provide a platform for salvage, including a large-scale grapple, and anchors and winches for ROV operations. Plaintiff's Additional SMF ¶ 22; Brooks Aff. ¶ 13.  Fuel-carrying capacity was increased, and hydraulics were substantially upgraded.  *Id.*  The Sea Hunter was to be the primary platform from which Sea Hunters would seek to survey and eventually bring up artifacts from the wreck. Plaintiff's Additional SMF ¶ 23; Intervenor's Reply SMF ¶ 23.[44]

---

[43] Mission Recovery's objection to this statement on the basis that it is conclusory and lacks foundation, Intervenor's Reply SMF ¶ 16, is overruled.  While the statement is not detailed, it is not conclusory.  Brooks, the general manager of Sea Hunters, Brooks Aff. ¶ 1, authenticates Exhibit A as the risk warnings from the securities offerings, *id.* ¶ 11.

[44] I omit paragraph 24, Plaintiff's Additional SMF ¶ 24, which is neither admitted nor supported by any record citation.

While Brooks had a small ROV (the Hy Ball) for several years, Sea Hunters purchased a new "Mark V" ROV for close to $400,000 for the primary purpose of observing and possibly recovering small items from the vessel with a "grabber." Plaintiff's Additional SMF ¶ 25; Brooks Aff. ¶ 14.

The Sea Hunter was ready to go in mid-summer 2009, and initial efforts commenced. Plaintiff's Additional SMF ¶ 26; Intervenor's Opposing SMF ¶ 26. The Sea Hunter has been physically at the wreck site during July 20-29, 2009, August 2-19, 2009, September 5-8, 2009, September 19-21, 2009, October 26-27, 2009, July 15-17, 2010, July 30-August 2, 2010, August 10-12, 2010, August 21-22, 2010, September 11-14, 2010, October 11-13, 2010, April 7-9, 2011, May 3, 2011, June 3-9, 2011, July 1-6, 2011, July 26-August 5, 2011, August 16-19, 2011, October 10-12, 2011, October 22-23, 2011, April 29-May 2, 2012, May 11-13, 2012, May 22-26, 2012, June 8-14, 2012, August 8-17, 2012, September 23-30, 2012, March 28-31, 2013, and August 29-31, 2013. *Id*. ¶ 76. In addition, another vessel used by Sea Hunters, the Son Worshipper, went to the wreck site a few times in 2009 to help set the anchors and moorings. *Id*. Her last trip to the site was April 24, 2012, to do a side scan survey. *Id*.

Summaries of these trips to the wreck site in 2009 indicated that:

1.     On the trip commencing on July 20, the crew set up a mooring system consisting of four 10,000-pound anchors with 1,500 to 1,800 feet of steel cable attached to four 1,000-gallon tanks used as buoys. Plaintiff's Additional SMF ¶ 26; Intervenor's Reply SMF ¶ 26. Testing was performed that revealed there was insufficient hydraulic fluid to operate the grapples as intended at a 700-foot depth, and technical problems with side-scan sonar hardware. *Id*. There were also long periods of bad weather. *Id*. These kinds of difficulties are common in such salvage efforts. *Id*. Repairs were made upon return to Portland. *Id*.

2. On the trip commencing on August 2, the large grapple was deployed and lowered to the sea bed less than 50 feet from the wreck, and 1,000 pounds of clay, mud, and debris were retrieved. *Id*. The material was found to contain pieces of rusty material and wire parts but nothing of any importance. *Id*. A hydraulic pump failed and was replaced with a spare pump. *Id*. The new Mark V ROV was deployed but the current caused its umbilical to wrap around one of the mooring cables. *Id*. The ROV was freed, but failed. *Id*. The ROV company was notified and took a few weeks to figure out the problem. *Id*.

3. On the trip commencing on September 3, the weather became unsafe for operations, with the seas building to eight to 14 feet. *Id*. It took several hours, and dangerous maneuvers, to disconnect the mooring cables because of the rough seas.

4. On the trip commencing on September 19, the PLC board that runs the hydraulic systems failed. *Id*. The trip was aborted on September 21, and the Sea Hunter returned to the wreck site on September 26 to find that all but one of its mooring buoys was missing and needed to be replaced at a cost of $30,000 to $50,000. *Id*. The season ended. *Id*.

Several difficulties were encountered at this stage, which is not atypical. *Id*. ¶ 28. For example, repairs to the Mark V ROV, a very complex and sophisticated piece of equipment, took about two months. *Id*. In addition, due to a number of factors that included the degree of vessel movement, weather, and undersea currents, the large "grabber" attached to the winch on the vessel proved incapable of accomplishing the task of serving as a possible method of puncturing holes in the hull to access the interior. *Id*.

During the 2010-11 summer seasons, extensive activities took place on the site. *Id*. ¶ 29. After heading to the site on July 15, 2010, the Sea Hunter encountered heavy fog. *Id*. There were several ROV missions, but the Mark V ROV was still not performing fully. *Id*. On July

30, the Sea Hunter lost an anchor and had to head back to Boston to get another. *Id*. After getting an anchor and rigging a chain and cable, the Sea Hunter returned to the site on August 10, making several trips to the ocean floor with a grapple. *Id*. The use of anchors at that depth unfortunately can be difficult. *Id*. On August 21, the Sea Hunter headed to the site again. *Id*. More grappling was done, as well as ROV missions. *Id*. Crew members realized that they probably could not do a recovery from inside the vessel with the Mark V ROV and tried to find something outside of the wreck. *Id*. They tried without success to find contractors that had an available, larger, work-class ROV. *Id*. On September 11, the Sea Hunter headed to the site to try to recover five lost anchors, each weighing between 10,000 and 12,000 pounds, which would have helped in mooring the ship over the wreck site. *Id*. The crew dragged the custom grapple hook through the day to grapple anchor cables with no luck. *Id*. The cable and grapple were lost, and a new grapple hook was built. *Id*. A hydraulic hose burst. *Id*. On October 11, the Sea Hunter headed to the site and did several ROV missions and more grappling. *Id*. The crew was still seeking appropriate contractors to help with better equipment. *Id*. A new cable was purchased for the A-frame winch and mooring winches. *Id*. The season ended. *Id*.

The Sea Hunter commenced the 2011 season on April 7, 2011, with a trip to the site for ROV operations. *Id*. The current was very strong, making it hard to move the Mark V ROV around on the bottom. *Id*. A submarine was purchased to better view the bottom close to the Port Nicholson, but it was used and in pieces. *Id*. The crew spent the summer of 2011 rebuilding it but could not get it ready in time for operations in 2011. *Id*. On June 3, the Sea Hunter headed to the site again. *Id*. It lost another anchor, headed to Boston to pick up an anchor it had purchased, and returned, but bad weather prevented further operations. *Id*. On July 1, the Sea Hunter returned to the site and began ROV operations, but the ROV tether broke. *Id*.

The ROV located and brought to the surface the Port Nicholson's ship compass. *Id.* Searches were made around the wreck for any artifacts or boxes. *Id.* On July 26, the Sea Hunter returned to the site. *Id.* ROV operations started, but there were thruster problems on the ROV and strong currents, and bad weather stopped operations. *Id.* On August 16, the Sea Hunter headed to the site again but encountered thick fog and six- to eight-foot swells, too rough to launch the ROV. *Id.* On October 10, the Sea Hunter returned to the site, dropped anchors, and undertook ROV operations. *Id.* The forward windlass motor burned out, and the crew had to cut the anchor chain and attach it to a buoy. *Id.* They tried to grapple the anchor. *Id.* The starboard generator blew a piston, and hydraulics broke down. *Id.* On October 22, the Sea Hunter headed to the site to try to retrieve a lost bow anchor, encountered serious electrical problems aboard, as a result of which the crew could not run equipment, and headed back to Boston. *Id.* The season ended. *Id.*

In 2011, Sea Hunters recovered a number of items from the vessel, including the ship's compass, a brick, and a fire extinguisher. Plaintiff's Additional SMF ¶ 30; Brooks Aff. ¶ 17.[45]

Sea Hunters had very substantial operating expenses, including costs of crew, fuel, insurance, and equipment acquisition, rental, and repairs. Plaintiff's Additional SMF ¶ 31; Brooks Aff. ¶ 18. For example, fuel alone costs hundreds of thousands of dollars. *Id.* By 2011, the initial funding had all but run out, and an additional round of financing raised approximately $1 million for continued operations. Plaintiff's Additional SMF ¶ 32; Brooks Aff. ¶ 18.

The need for additional financing is not uncommon in extensive salvage operations, and was specifically pointed out to the investors in the initial financing. Plaintiff's Additional SMF ¶ 33; Brooks Aff. ¶ 19. In the salvage industry, each round of financing usually involves a separate limited partnership. Plaintiff's Additional SMF ¶ 34; Brooks Aff. ¶ 20. Once all of the

---

[45] Mission Recovery denies this, Intervenor's Reply SMF ¶ 30; however, I view the evidence in the light most favorable to Sea Hunters, as nonmovant.

limited partner slots for Sea Hunters were filled, Sea Hunters could not take on additional limited partners without diluting all of the existing partnership interests; hence, it obtained additional financing in 2011 through Deep Sea. Plaintiff's Additional SMF ¶ 35; Brooks Aff. ¶ 20.[46] A second round of financing, approaching $1 million, was obtained from investors in Deep Sea, including Stochel, who later formed Mission Recovery. Plaintiff's Additional SMF ¶ 36; Brooks Aff. ¶ 21.[47] A third round of financing in 2012 of just under $2 million involved investors who later (briefly) entered into a joint venture with Sea Hunters. Plaintiff's Additional SMF ¶ 37; Brooks Aff. ¶ 21.

With financing from Hardy and the three rounds of financing referred to above, as well as some modest additional funding, total funding by the end of 2011 approached $8 million, more than $2 million of which had been spent on the acquisition and refurbishment of the Sea Hunter vessel. Plaintiff's Additional SMF ¶ 38; Brooks Aff. ¶ 22.[48]

In 2012, a video was taken that identified the vessel as the Port Nicholson. Plaintiff's Additional SMF ¶ 40; Brooks Aff. ¶ 24.[49] Also in 2012, Sea Hunters recovered additional items from the wreck site, including a box of hatchets. Plaintiff's Additional SMF ¶ 41; Brooks Aff. ¶ 23.[50] Also in 2012, the services of the Deep Down Inc. ("Deep Down") ROV were acquired after its provider reviewed the Sea Hunter vessel to determine if it could perform tasks that included penetrating the hull as needed. Plaintiff's Additional SMF ¶ 42; Brooks Aff. ¶ 25.

---

[46] Mission Recovery's objection to this statement on the basis that it defies common business sense, Intervenor's Reply SMF ¶ 35, is overruled. This goes to the weight, rather than the admissibility, of the evidence.

[47] Mission Recovery qualifies this statement, Intervenor's Reply SMF ¶ 36, asserting that the statement suggests that the financing for Sea Hunters was obtained from Deep Sea investors, which is contrary to the offering documentation provided by Deep Sea to its investors, Exh. 1 (ECF No. 153-1) to Mission Recovery LLC's Reply to Sea Hunters' Opposition to Mission Recovery's Motion To Intervene (ECF No. 153).

[48] Mission Recovery denies this, Intervenor's Reply SMF ¶ 38; however, I view the evidence in the light most favorable to Sea Hunters, as nonmovant.

[49] Mission Recovery denies this, Intervenor's Reply SMF ¶ 40; however, I view the evidence in the light most favorable to Sea Hunters, as nonmovant.

[50] Mission Recovery denies this, Intervenor's Reply SMF ¶ 41; however, I view the evidence in the light most favorable to Sea Hunters, as nonmovant.

Unfortunately, the Deep Down ROV was unsuccessful, notwithstanding the promises made by the provider, eventually resulting in separate litigation in this court. Plaintiff's Additional SMF ¶ 43; Brooks Aff. ¶ 25. Sea Hunters believed that this expensive undertaking by a reputable firm would succeed, but it did not. Plaintiff's Additional SMF ¶ 44; Intervenor's Reply SMF ¶ 44. Deep Down was fully aware of the nature of the Sea Hunter vessel platform, and its attempts to blame the vessel for the failure of its own ROV to perform as promised are not well-taken. Plaintiff's Additional SMF ¶ 45; Brooks Aff. ¶ 25. Also in 2012, the Mark V ROV was finally successful in entering the hull and, in Hold Number 3, obtained a video of the interior showing obstructions of various kinds. Plaintiff's Additional SMF ¶ 46; Brooks Aff. ¶ 26.

Developments in 2013 included the rental of the "Out Land" ROV and the purchase of a "Video Ray" ROV. Plaintiff's Additional SMF ¶ 47; Brooks Aff. ¶ 27. Notwithstanding a serious fire, the Video Ray ROV succeeded in entering the stairwell leading up to Hold Number 3, where it identified cargo of interest, although not clearly identified as gold or platinum bars. Plaintiff's Additional SMF ¶ 48; Brooks Aff. ¶ 27.

In the spring of 2013 Sea Hunters faced a difficult choice: it could initiate another round of financing now that the vessel and likely presence of valuable cargo were more clearly known or, under its agreements with prior investors, enter into a joint venture with third parties providing funding, technology, and know-how in exchange for a percentage of the gross salvor share of the recovery. Plaintiff's Additional SMF ¶ 49; Brooks Aff. ¶ 28.[51] Three different joint venture agreements were considered, the first being the proposal of Stochel, in a brief document presented in May 2013. Plaintiff's Additional SMF ¶ 50; Brooks Aff. ¶ 29.

---

[51] Mission Recovery denies this, Intervenor's Reply SMF ¶ 49; however, I view the evidence in the light most favorable to Sea Hunters as nonmovant.

The Stochel proposal was problematic for a number of reasons. Plaintiff's Additional SMF ¶ 51; Brooks Aff. ¶ 29. First, he requested a 75 percent share of all salvor monies. *Id*. Second, there was no assured source of funding. *Id*. The commitments that Stochel allegedly had received were predicated on the ability to bring up one sample of gold (or the equivalent). *Id*. Next, an actual operational plan was something that was to be negotiated over some unknown period of time with unspecified participation by Swire, a Norwegian firm. *Id*.[52] Although Sea Hunters' manager carefully considers any potential source of funding, the Stochel proposal did not look promising and was not accepted. Plaintiff's Additional SMF ¶ 52; Intervenor's Reply SMF ¶ 52.

In the fall of 2013, Sea Hunters received a joint venture proposal from individuals who had previously invested with Sea Hunters. Plaintiff's Additional SMF ¶ 53; Brooks Aff. ¶ 30 & Exh. C (ECF No. 264-7) thereto. This resulted in the signing of a joint venture agreement with potential to raise up to $10 million. *Id*.[53] The joint venture was premised on the funding partners receiving 39 percent of the gross salvor share. *Id*. After the agreement was signed, the joint venturers ceased to perform, acknowledging in writing in December 2013 that they were not going forward with the joint venture. Plaintiff's Additional SMF ¶ 54; Brooks Aff. ¶ 31. They gave several reasons, but the primary one was their lack of confidence in the documentation of the cargo. *Id*.

The third joint venture proposal came through Tony Dyakowski of Vancouver, British Columbia, on behalf of a very experienced salvor, Donald Rodocker, and his son Jesse

---

[52] Mission Recovery's denial, Intervenor's Reply SMF ¶ 51, is in the nature of a qualification: that, while Stochel initially proposed that Mission Recovery retain 75 percent of any salvage award, he alternatively proposed 45 percent, Affidavit of Daniel E. Stochel (ECF No. 145-2), attached to Mission Recovery LLC's Motion To Intervene (ECF No. 145), ¶ 10. I omit portions of paragraph 51, sustaining in part Mission Recovery's objection that the balance of the statement is conclusory and without foundation.
[53] Mission Recovery denies this, Intervenor's Reply SMF ¶ 53; however, I view the evidence in the light most favorable to Sea Hunters, as nonmovant.

Rodocker.  Plaintiff's Additional SMF ¶ 55; Intervenor's Reply SMF ¶ 55.  Dyakowski and the Rodockers formed Port Nicholson Salvage Consortium, LLC ("PNSC") specifically for the purpose of salvaging valuable cargo from the Port Nicholson.  *Id*. ¶ 56.  PNSC and Sea Hunters executed a joint venture agreement in January 2014.  *Id*. ¶ 57.

Donald Rodocker, manager of PNSC, has been involved in underwater salvage since the mid-1960s when he was a diver with the U.S. Navy.  *Id*. ¶ 58.  He played a key role in the recovery of gold from the World War II vessel HMS Edinburgh, sunk by the Germans, which was discovered and salvaged off of the Russian coast, near Murmansk, in the 1980s.  Plaintiff's Additional SMF ¶ 58; Rodocker Aff. ¶ 3.  The recovery effort took years to accomplish, with many twists and turns that included the peculiarities and personalities of key individuals, technological developments and risks and misadventures of various kinds, and legal and financial issues combined with the vicissitudes of working under water subject to the perils of the sea and the vagaries of the weather.  *Id*.  In the end, a significant amount of gold was recovered.  *Id*.

In the 1970s, Donald Rodocker and other divers explored the wreck of the Andrea Doria, located about 50 miles from the Port Nicholson, building in successive dives on information learned in prior dives.  Plaintiff's Additional SMF ¶ 58; Rodocker Aff. ¶ 4.  He supplied breathing equipment on a "no cure no pay" basis for efforts in the 1980s in the English Channel, in strong currents and bad weather, to salvage the Medina, sunk by Germans in World War II.  Plaintiff's Additional SMF ¶ 58; Rodocker Aff. ¶ 5.  Thousands of items were recovered using saturation dives.  *Id*.

In 1986, Donald Rodocker founded ROV maker Hydrovision, which manufactured the Hy Ball purchased by Brooks.  Plaintiff's Additional SMF ¶ 58; Rodocker Aff. ¶ 6.  In the 1990s

he developed the designs for the products that became the basis of the SeaBotix Company ("SeaBotix"), which manufactures and sells small remotely operated undersea vehicles that operate with a tether from which control is exercised. *Id*. SeaBotix, a successful company, was ultimately sold to a publicly-held company, Bolt Technologies. *Id*. As founder of Hydrovision and SeaBotix, Donald Rodocker has been involved in many projects aimed at recovering items from deep in the sea. *Id*. He used his SeaBotix experience to configure the effort in May 2014 and build upon information from Sea Hunters' efforts. *Id*.

Jesse Rodocker has extensive maritime experience with SeaBotix and elsewhere, and more than 10 years' experience operating ROVs. Plaintiff's Additional SMF ¶ 59; Intervenor's Reply SMF ¶ 59.

The advantages of the joint venture with PNSC are that it sets forth a specific plan of action, is financed by successful entrepreneurs, the Rodockers having sold their ROV company to a publicly-held company for millions of dollars, and the members of PNSC have extensive experience in salvage operations and extensive contacts. Plaintiff's Additional SMF ¶ 60; Brooks Aff. ¶ 33.[54] When asked if PNSC had the technical ability to recover valuable cargo from the Port Nicholson, Donald Rodocker responded, "If it's there, we can get it." Plaintiff's Additional SMF ¶ 61; Rodocker Aff. ¶ 11. His statement was based on the information he had about the wreck from Sea Hunters' records and his extensive experience with ROVs,

---

[54] Mission Recovery's objection that this statement is conclusory, mere conjecture, and without foundation, Intervenor's Reply SMF ¶ 60, is overruled. Brooks avers that his affidavit is made on personal knowledge and, as general manager of Sea Hunters, Brooks Aff. ¶ 1, is in a position to speak to the relative merits of the PNSC joint venture proposal from Sea Hunters' point of view. Mission Recovery alternatively denies that the joint venture agreement provides that the Rodockers will underwrite all costs, Intervenor's Reply SMF ¶ 60; however, I view the evidence in the light most favorable to Sea Hunters as nonmovant.

autonomous underwater vehicles ("AUVs"), and saturation diving with humans involving many risks. *Id*.[55]

The three members of PNSC are all successful serial entrepreneurs. Plaintiff's Additional SMF ¶ 62; Rodocker Aff. ¶ 15. Donald Rodocker has bought and sold about 30 companies. *Id.* The three members, should they choose to do so, have adequate funding for the task at hand, using customary no-cure-no-pay arrangements with which they are quite familiar. *Id*. The May 2014 expedition was fully funded and cost approximately $150,000. *Id*. PNSC currently has about $350,000 in its checking account. *Id*. Although PNSC has personal assets to proceed, it also has access to outside investors as necessary. *Id*.

PNSC and Sea Hunters are proceeding to initiate the plan outlined in the joint venture agreement, beginning with AUV sonar scanning and ROV close-in inspection of the exterior and, to the extent accessible, the interior of the vessel. Plaintiff's Additional SMF ¶ 63; Brooks Aff. ¶ 34; Rodocker Aff. ¶ 12. PNSC's ability to understand the situation with the Port Nicholson, 700 feet below the surface and many miles from the United States coast, is premised on, and builds upon, knowledge gained over the last several years by Sea Hunters. Plaintiff's Additional SMF ¶ 64; Rodocker Aff. ¶ 9.[56]

In addition to Jesse Rodocker, PNSC's salvage team includes David Willis, who has 20 years of ROV experience and is the owner of SeaBotix Australia, Rich Ricketts, chief engineer for the diving company Wharton & Williams and owner of SeaTools, a maker of ROV components and accessories, and Chad Nelson, an AUV/ROV operator for Orca Maritime. Plaintiff's Additional SMF ¶ 65; Intervenor's Reply SMF ¶ 65.

---

[55] Mission Recovery's objection that paragraph 61 sets forth opinions rather than facts, Intervenor's Reply SMF ¶ 61, is overruled. The paragraph sets forth a fact: Donald Rodocker's opinion.

[56] Mission Recovery's objection that paragraphs 63 and 64 set forth opinions rather than facts, Intervenor's Reply SMF ¶¶ 63-64, is overruled.

PNSC has available, and used in May 2014, ROVs, some of which are quite small, to enter the Port Nicholson through various openings such as open hatches. Plaintiff's Additional SMF ¶ 66; Rodocker Aff. ¶ 13.[57] In May 2014, Sea Hunters successfully entered the vehicle with ROVs but found the ROV operating circumstances of weather and currents very difficult and encountered many obstructions to ROV access to internal spaces, including nets, pipes, and silt. Plaintiff's Additional SMF ¶ 67; Rodocker Aff. ¶ 13.

Although the AUV site-scan sonar survey was not completed in May 2014 due to technological difficulties that are fairly common, PNSC had arranged in principle as of that time for the balance of the AUV work to be completed within 30 to 60 days by Ocean Server. Plaintiff's Additional SMF ¶ 68; Rodocker Aff. ¶ 14.[58]

As of May 2014, it appeared that any valuable cargo was in portions of the hull inaccessible by ROVs alone, and, therefore, a separate undertaking would be necessary to pierce the hull using grab technology and/or saturation divers. Plaintiff's Additional SMF ¶ 70; Rodocker Aff. ¶ 14. PNSC had on site, along with three top-of-the-line ROVs, the University of Connecticut research vessel R/V Connecticut under charter with specialized dynamic positioning capabilities that keep it on station within a very limited range of movement, so as to enhance the capabilities of the multiple ROVs to function at the wreck site 700 feet below the surface. Plaintiff's Additional SMF ¶ 71; Rodocker Aff. ¶ 24. Day-to-day control of the salvage project has now been transferred to PNSC, subject always to compliance with the Joint Venture Agreement and its undertaking to report to the court. Plaintiff's Additional SMF ¶ 72; Rodocker Aff. ¶ 22.

---

[57] I omit the remainder of paragraph 66, Plaintiff's Additional SMF ¶ 66, sustaining in part Mission Recovery's objection, Intervenor's Reply SMF ¶ 66, that the statement, as worded, sets forth opinion rather than fact.

[58] I omit paragraph 69, Plaintiff's Additional SMF ¶ 69, sustaining Mission Recovery's objection, Intervenor's Reply SMF ¶ 69, that the statement, as worded, sets forth opinion rather than fact.

Sea Hunters' activities have taken place in some of the most difficult circumstances encountered by a highly experienced salvage expert. Plaintiff's Additional SMF ¶ 73; Rodocker Aff. ¶ 9. Conditions at the site of the Port Nicholson are among the most difficult another salvage expert has ever encountered – a 9 on a scale of 1 to 10 in difficulty because those conditions include high currents, winds, hazardous debris, and poor visibility. Plaintiff's Additional SMF ¶ 74; Declaration of Jesse Rodocker (ECF No. 264-14), attached to Plaintiff's SMFs, ¶ 4.[59]

A detailed log of the Sea Hunter's activities has been maintained. Plaintiff's Additional SMF ¶ 77; Brooks Aff. ¶ 40. Sea Hunters has physically marked the location of the wreck. *Id.* It has taken dozens of hours of video of the wreck, the surrounding area, and the salvage efforts, as well as still photographs. *Id.* It has taken sonar scans of the wreck and obtained other technical readings. *Id.* In order to accomplish these tasks, its crew frequently had to expose themselves to considerable physical peril. *Id.* In addition, researchers hired by Sea Hunters as independent contractors have amassed hundreds of documents pertaining to the Port Nicholson and the historical background of its last voyage, as well as analyses to put these documents into perspective. Plaintiff's Additional SMF ¶ 78; Brooks Aff. ¶ 41.[60]

Sea Hunters has retrieved several items from the vessel, as described in the inventory filed with the court on December 6, 2013. Plaintiff's Additional SMF ¶ 79; Exh. B to 12/6/13 Status Report; Brooks Aff. ¶ 42. Some of these artifacts such as the ship's compass have significant value, although they are not the focus of Sea Hunters' salvage efforts. *Id.*

---

[59] Mission Recovery's objection that this statement represents Jesse Rodocker's opinions and cannot constitute facts for this purpose, Intervenor's Reply SMF ¶ 74, is overruled. The statement, as worded, sets forth a "fact" – Jesse Rodocker's opinion. By contrast, I sustain Mission Recovery's objection, *id.* ¶ 75, that paragraph 75, as worded, Plaintiff's Additional SMF ¶75, sets forth opinion in the guise of facts.

[60] Mission Recovery purports to deny this, Intervenor's Reply SMF ¶ 78, but improperly relies on citation to the pages of a brief (the UK DfT Response/Plaintiff). In any event, I view the evidence in the light most favorable to Sea Hunters as nonmovant.

The frequency of Sea Hunters' trips to the wreck site has at times been circumscribed by its financial situation. Plaintiff's Additional SMF ¶ 80; Brooks Aff. ¶ 46. Nonetheless, it has never ceased its operations and remains thoroughly committed to seeing the Port Nicholson salvage project to the end. *Id.*[61] Sea Hunters currently has funds in its account necessary to meet its ongoing expenses for the foreseeable future. Plaintiff's Additional SMF ¶ 81; Brooks Aff. ¶ 47. To the extent that it were to have funding needs that could not be met by PNSC, it has tangible assets that could be sold to raise additional capital, including the Sea Hunter, which has been appraised at $5,125,000. *Id.*[62] Some of Sea Hunters' investors have been strongly encouraged by its progress toward its goal of salvaging cargo from the Port Nicholson after meeting with representatives of Sea Hunters and PNSC and are satisfied that real progress is being made. Plaintiff's Additional SMF ¶ 84; Affidavit of David Shugars ("Shugars Aff.") (ECF No. 264-15), attached to Plaintiff's SMFs, ¶ 2; Affidavit of Stephan Lanfer ("Lanfer Aff.") (ECF No. 264-16), attached to Plaintiff's SMFs, ¶ 2. As a result, they have advanced additional monies for the project. *Id.*

Stochel, Mission Recovery's sole member, has never owned a boat or operated salvage equipment. Plaintiff's Additional SMF ¶ 88; Intervenor's Reply SMF ¶ 88. He had no prior experience with adventures involving undersea salvage. *Id.* ¶ 90. Stochel is the sole employee of Mission Recovery. *Id.* ¶ 94. Under Mission Recovery's proposal, all recovery and salvage work on the Port Nicholson would be done by Swire. Plaintiff's Additional SMF ¶ 95; Second

---

[61] Mission Recovery denies this, Intervenor's Reply SMF ¶ 80; however, I view the evidence in the light most favorable to Sea Hunters as nonmovant.

[62] I omit the second sentence of paragraph 81, Plaintiff's Additional SMF ¶ 81, sustaining in part Mission Recovery's objection that the paragraph does not set forth facts, Intervenor's Reply SMF ¶ 81, and otherwise overrule the objection. I also omit paragraphs 82 and 83, Plaintiff's Additional SMF ¶¶ 82-83, sustaining Mission Recovery's objection, Intervenor's Reply SMF ¶¶ 82-83, that they are statements of opinion, not fact.

Stochel Aff. ¶ 9.[63]  Mission Recovery currently has no binding contract with Swire for Swire to do anything.  Plaintiff's Additional SMF ¶ 96; Stochel Dep. at 109.[64]  Neither Mission Recovery nor Swire has a written salvage plan for the Port Nicholson.  Plaintiff's Additional SMF ¶ 100; Stochel Dep., Exh. A (ECF No. 264-3) to Affidavit of Marshall J. Tinkle (ECF No. 264-2), attached to Plaintiff's SMFs, at 104.[65]

Sea Hunters' other investors oppose Mission Recovery's attempt to replace Sea Hunters on the ground that, were the attempt to succeed, they would be irreparably harmed in that they would lose the benefit of their bargain with Sea Hunters and would lose all or a substantial portion of the sums they have invested.  Plaintiff's Additional SMF ¶ 103; Shugars Aff. ¶ 3; Lanfer Aff. ¶ 3.

## B.  Discussion

Mission Recovery seeks summary judgment with respect to its bid to replace Sea Hunters as salvor-in-possession on the basis that Sea Hunters fails the applicable test for "maintain[ing] its franchise to the exclusion of others," namely, that its salvage efforts be "(1) undertaken with due diligence, (2) ongoing, and (3) clothed with some prospect of success."  Intervenor's S/J Motion at 7 (quoting *Martha's Vineyard Scuba Headquarters, Inc. v. Unidentified, Wrecked & Abandoned Steam Vessel*, 833 F.2d 1059, 1061 (1st Cir. 1987)).  The motion should be denied.

Mission Recovery demonstrates that Sea Hunters has recovered no cargo items of any significant value from the Port Nicholson since being appointed substitute custodian in 2008, did not report the recovery of any items in 2012 and 2013, and made only two trips to the wreck site

---

[63] Mission Recovery denies this, Intervenor's Reply SMF ¶ 95; however, I view the evidence in the light most favorable to Sea Hunters as nonmovant.
[64] Mission Recovery denies this, Intervenor's Reply SMF ¶ 96; however, I view the evidence in the light most favorable to Sea Hunters as nonmovant.
[65] Mission Recovery denies this, Intervenor's Reply SMF ¶ 100; however, I view the evidence in the light most favorable to Sea Hunters as nonmovant.

in 2013.  *See* Intervenor's SMF ¶¶ 2-4; Status Reports; Plaintiff's Opposing SMF ¶ 4.  Yet, these facts, standing alone, do not necessarily mean that Sea Hunters has not been duly diligent or that its efforts have not been ongoing or are not clothed with some prospect of success.

With respect to the first factor, "[t]here is no set formula with which to measure the due diligence of a salvor; rather, the nature and situation of the operations and the site itself will affect the requisite amount of control necessary to retain exclusive rights to the site." *Columbus-Am. Discovery Grp., Inc. v. Unidentified, Wrecked & Abandoned Sailing Vessel*, Civil Action No. 2:87cv363, 2014 WL 3827812, at *7 (E.D. Va. July 14, 2014) (citation and internal quotation marks omitted).  With respect to the second factor, "[t]he evaluation of whether a salvor's operations are 'ongoing' focuses not only on past operations, but also on present intentions." *R.M.S. Titanic, Inc. v. Wrecked & Abandoned Vessel*, 924 F. Supp. 714, 723 (E.D. Va. 1996).  Finally, while the recovery of valuable artifacts, combined with the financial capability to finance further salvage operations, handily demonstrates that a salvor's efforts are clothed with some prospect of success, *see, e.g., id*. at 724, a salvor need not necessarily have succeeded in salvaging valuable items to meet the third test, *see, e.g., id*. at 720 ("because salvage rights are not necessarily permanent, admiralty courts have more freedom to protect salvage operations that are *substantial and promising though not yet successful*") (citation and internal quotation marks omitted) (emphasis in original).  Equitable considerations inform salvage-rights determinations.  *See, e.g., id*. (noting the "flexible nature of salvor-in-possession rights and the equitable considerations that courts weigh when evaluating the appropriateness of awarding those rights").

While Sea Hunters' failure to date to recover any valuable cargo is cause for concern, a reasonable fact-finder viewing the evidence in the light most favorable to it could conclude that it meets the *Martha's Vineyard* test. Specifically, a fact-finder could determine that:

1.    Sea Hunters has been duly diligent, having persisted in an unusually challenging salvage effort, grappled with such hurdles as poor and even dangerous weather, equipment failure and loss, and dwindling capital reserves, and made trips to the wreck site during each year's short salvage season since 2009.

2.    Sea Hunters' salvage efforts are ongoing, as demonstrated not only by its past operations but also by its plans, in conjunction with PNSC, to complete an AUV site-scan sonar survey and then attempt to pierce the Port Nicholson's hull to gain access to any valuable cargo using grab technology and/or saturation divers.[66]

3.    Despite Sea Hunters' failure after six salvage seasons to retrieve a single item of valuable cargo, or for that matter virtually any artifacts, its efforts are clothed with some prospect of success. It is poised to draw not only upon the knowledge and insights gained from its own long-running attempts to salvage the Port Nicholson but also upon the extensive experience, savvy, and financial resources of PNSC's principals.

In any event, Mission Recovery adduces virtually no cognizable evidence regarding its own bid to be appointed salvor-in-possession. This, in itself, is insufficient as a matter of law to demonstrate on summary judgment that it is better qualified than Sea Hunters to effectuate the Port Nicholson's salvage.

---

[66] I take judicial notice that on June 23, 2014, subsequent to Sea Hunters' filing of its opposing and additional statements of material facts, it reported that operations in May 2014 enabled it to plot the debris field and orientation of the wreck, including attitude/heading and torpedo damage, and that it had obtained sonar data and video of the interior of Hold Number 3. Report on the Survey of the Wreck Port Nicholson, Exh. A (ECF No.283) to Plaintiff's Status Report ("6/23/14 Status Report") (ECF No. 282), at 8.

## V. Conclusion

For the foregoing reasons, I ***DENY*** Mission Recovery's request for oral argument, ***GRANT*** Sea Hunters' motion to strike in part, with respect to those portions of the UK DfT's opposing brief that bear on the merits of the cross-motions for summary judgment, as well as statements of opposing and additional facts and record materials filed in support thereof, and otherwise ***DENY*** it, and recommend that the court ***DENY*** Sea Hunters' and Mission Recovery's cross-motions for summary judgment and ***DEEM*** Mission Recovery's motion for a preliminary injunction ***MOOT***.


## ***NOTICE***

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof. A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*


Dated this 29th day of November, 2014.


/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge